# EXHIBIT "3"

AGREEMENT BY AND BETWEEN

1199 SEIU UNITED HEALTHCARE WORKERS EAST

- and -

GREATER NEW YORK HEALTH CARE
FACILITIES ASSOCIATION, INC.

June 30, 2009 - September 30, 2014

(Licensed Practical Nurses Unit)



1.  BARGAINING UNIT ................................................................................................. 2
2.  UNION SECURITY..................................................................................................... 3
3.  PROBATIONARY PERIOD ........................................................................................ 3
4.  DISCHARGE AND DISCIPLINE................................................................................. 4
5.  NO DISCRIMINATION .............................................................................................. 4
6.  UNION RIGHTS ........................................................................................................ 4
7.  SENIORITY/JOB PROTECTION................................................................................. 6
8.  NO STRIKE OR LOCKOUT........................................................................................ 7
9.  GRIEVANCE PROCEDURE...................................................................................... 10
10. WORK WEEK.......................................................................................................... 10
11. AGENCY EMPLOYEES, TEMPORARY EMPLOYEES, STAFFING SCHEDULES SLOTTED AND
    NON-SLOTTED EMPLOYEES (PERMANENT AND REPLACEMENT EMPLOYEES)................. 14
12. WAGE INCREASES ................................................................................................ 15
13. MINIMUM RATES OF PAY/LONGEVITY PAY/EXPERIENCE RATES ......................... 16
14. SHIFT DIFFERENTIAL.............................................................................................. 16
15. MEALS ................................................................................................................... 16
16. HOLIDAYS.............................................................................................................. 17
17. VACATIONS............................................................................................................ 18
18. LEAVES.................................................................................................................. 20
19. UNIFORMS ............................................................................................................ 20
20. MAINTENANCE OF STANDARDS........................................................................... 20
21. DISABILITY BENEFITS ............................................................................................ 20
22. MISCELLANEOUS EMPLOYEE BENEFITS .............................................................. 21
23. BENEFIT FUND....................................................................................................... 22
24. PENSION FUND...................................................................................................... 22
25. EDUCATION FUND................................................................................................. 23
26. JOB SECURITY FUND............................................................................................. 24
27. WORKER PARTICIPATION FUND
27A. GREATER NEW YORK WORKER PARTICIPATION/LONG TERM CARE ADVOCACY PROJECT
     (GNYWPF/LTCAP) ............................................................................................... 25
                                                                                                           26
28. CHILD CARE FUND ................................................................................................ 27
29. FUND CONTRIBUTIONS AND CONTRIBUTION RATES .......................................... 34
30. PENSION AND HEALTH BENEFITS......................................................................... 35
31. CREDIT UNION....................................................................................................... 35
32. SEVERANCE .......................................................................................................... 36
33. CHECK-OFF AUTHORIZATION............................................................................... 36
34. SEPARABILITY ....................................................................................................... 36
35. SUCCESSORS........................................................................................................ 36
36. NEW DIRECTION AND INNOVATION COMMITTEE ................................................. 37
37. REIMBURSEMENT CLAUSE .................................................................................... 38
38. MOST FAVORED NATION CLAUSE......................................................................... 38
39. MANAGEMENT RIGHTS......................................................................................... 39
40. RESIGNATION FROM THE ASSOCIATION

41. DURATION ....................................................................................................... 39

SCHEDULE A ....................................................................................................... 41

SCHEDULE B* ..................................................................................................... 42

SCHEDULE C ....................................................................................................... 43

ATTACHMENT "A" ............................................................................................... 45

ATTACHMENT "B" ............................................................................................... 46

ATTACHMENT "C" ............................................................................................... 49

ATTACHMENT D PENSION PREFERRED SCHEDULE ......................................... 50

ATTACHMENT E PAYMENT OF BARGAINING COMMITTEE MEMBERS ............... 52

ATTACHMENT F GNY BENEFIT FUND ................................................................ 53

ATTACHMENT G OTHER PROPOSED CHANGES FROM EMPLOYERS ................. 55

SIDE LETTER #1 .................................................................................................. 56

SIDE LETTER #2 .................................................................................................. 57

SIDE LETTER #3 .................................................................................................. 58

AGREEMENT made as of the 31st day of May, 2009 by and between 1199SEIU UNITED HEALTHCARE WORKERS EAST (hereinafter referred to as the "Union") on behalf of itself and its members in the bargaining unit (hereinafter referred to as the "Employees") now employed or hereafter to be employed by residential health care facility members of the GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIATION, INC. (formerly known as the Metropolitan New York Nursing Home Association, Inc.) (hereinafter referred to as the "Association") and the Association on behalf of itself and those of its present members and those hereafter becoming members, who have authorized or shall authorize the making of this Agreement (such members hereinafter being referred to as the "Employers") (See Schedule "A" for a listing of the Employers).

<u>W I T N E S S E T H</u>:

WHEREAS, the Association is a membership corporation consisting of Employers engaged in the ownership and/or operation of residential health care facilities; and

WHEREAS, the Union has been designated by the majority of the Employees of the Employers in the bargaining unit as their sole collective bargaining agent with respect of wages, hours and other conditions of employment; and

WHEREAS, the Association and the Union are committed to working together to maintain and improve the ability of the Employers to provide quality health care through joint labor-management efforts; to insure appropriate funding and resources for health care through joint legislative work; and to insure that there is affordable health care and access to long term residential health care for the residents of the State of New York; and

WHEREAS, it is recognized that the efficient and orderly method of establishing and maintaining peaceful and harmonious labor relations and of dealing with the problems and controversies arising out of employment is through negotiations and agreement, rather than through strikes and lockouts; and

WHEREAS, the Association and the Union recognize that labor strife will have a disruptive influence on their ability to engage in the foregoing efforts; and

WHEREAS, the Employers have reviewed the contract's economic provisions and have costed out its economic impact and state that the economic terms of this Agreement are predictable and sustainable for its term; and

WHEREAS, the contracting parties are desirous of maintaining and promoting the highest standards of service and labor unity;

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties agree as follows:

1

## 1.   BARGAINING UNIT

A. <u>Recognition and Description of Bargaining Unit</u>: The Association recognizes the Union as the exclusive bargaining agent for all Licensed Practical Nurses and other listed classifications in Schedule B employed by the Employers in an Association-wide bargaining unit consisting solely and exclusively of Licensed Practical Nurses and other listed classifications.

B. <u>Additions to Bargaining Unit, Neutrality and Card Count</u>: The existing procedures in the Schedule B footnote with respect to additions to the bargaining unit shall remain in effect, i.e., such additions may occur upon the Union's demonstration through a card count by the Impartial Chairman that it represents a majority of Employees heretofore unrepresented by it employed by any Employer member of the Association. Upon such a showing, such Employees shall thereafter be covered by all the terms and conditions of the collective bargaining agreement. These procedures shall also apply to any new or additional facility under an Employer's direction and control. The Employers shall remain neutral with respect to the decision of non-Union Employees to seek 1199 representation. The Employers shall not hold group or one-on-one captive audience meetings concerning Union representation. The Impartial Chairman shall have the power to enforce these provisions and to remedy any breaches thereof. In addition, if the Union claims that a classification is an accretion to its existing unit, the Impartial Chairman shall determine the unit status of the classification. In doing so, the Impartial Chairman may look to custom, usage and practice, as well as NLRB unit rules.

C. The Association represents that its authorizing members have agreed to be bound by the terms of this Agreement and have authorized the Association to enter into this Agreement on their behalf and on behalf of the Association.

## 2.   UNION SECURITY

A. The Employers shall, throughout the term of this Agreement, employ in the bargaining unit only members of the Union in good standing, except for the first thirty (30) days of employment or the first thirty (30) days after the effective date of this Agreement, whichever is later. All new Employees hereafter employed in the bargaining unit must become members of the Union thirty (30) days after commencing their employment.

B. The Union agrees to accept such new workers for membership without discrimination.

C. Written notice from the Union to any Employer stating that an Employee is no longer a member of the Union in good standing shall be conclusive upon the Employer who shall upon one (1) week's written notice from the Union, discharge such Employee. The Union

2

agrees to indemnify and hold the Employer harmless against any damages or expenses incurred by reason of discharge effected at the request of the Union.

D. The Employers recognize the right of the Union to elect Union Delegates and Union Committees to take up with the Employers, at reasonable times, the various problems that might arise at the place of employment.

E. The Employer shall forthwith give the Union a list of Employees covered by this Agreement including categories and wages and shall thereafter furnish the names, categories and wages of any new Employees in the bargaining unit within thirty (30) days after hire.

## 3.   PROBATIONARY PERIOD

A. Employees hired after June 1, 2009 whether they are new Employees with the Employer or have graduated from the nurse's aide classification, shall be deemed probationary during the first ninety (90) calendar days of their employment, during which time they may be discharged for any reason which need not be stated by the Employer.  If an upgraded Employee is retained as a Licensed Practical Nurse after the trial period, the Employee acquires seniority status in their higher classification, dating from the first day of the trial period.

B. Once having been employed, an Employee who is again hired more than thirty (30) calendar days after his or her first employment shall be deemed to have completed his or her probationary period and must then become a Union member, provided, however, that where there is a gap of ninety (90) days or more between the time the Employee last worked for the Employer and the date of his or her rehire (leave time excluded), then upon such rehiring the Employee shall be deemed a new Employee and the probationary period will commence anew.

## 4. DISCHARGE AND DISCIPLINE

A. <u>Just Cause Discharge:</u>

Upon the conclusion of his or her probationary period, no Employee shall be discharged or disciplined except for justifiable cause. No Employee shall be discharged prior to written notice from the Employer to the Union and the Union Delegate.

B. <u>Patient Abuse Discipline:</u>  The Employers shall conduct patient abuse investigations in an expeditious manner.  While it is the Union's position that no Employee should be suspended without pay pending investigation but should instead be maintained in their current position or reassigned to non-patient care duties with pay, in the event an Employer does suspend an Employee pending investigation the parties agree that it shall not do

3

so for more than four (4) days, excluding Saturdays, Sundays and holidays.  In the event the Employer's investigation cannot be completed within four (4) days due to the unavailability of a witness, then the Employer can continue the suspension for up to three (3) additional days, excluding Saturdays, Sundays, holidays.  If the investigation is still not complete, the Employer may request permission to extend the suspension, but cannot do so unless permission is granted by the Union.  The Employee may utilize any accrued paid time, i.e., vacation days and holidays.  In the event the Employer determines that the Employee did not engage in any wrongful act, then the Employee shall be fully compensated for all lost wages and/or any accrued paid time used.  This provision shall not be deemed a waiver of any rights under the grievance and arbitration provisions.

## 5. NO DISCRIMINATION

Neither the Employer nor the Union shall discriminate against or in favor of any Employee on account of race, color, creed, national origin, political belief, sex, sexual orientation, citizenship status, marital status, disability or age.  There shall be no sexual harassment in the workplace.

## 6. UNION RIGHTS

**A. Visitation:** The representative of the Union servicing the facility, or the Union's designee, shall have admission to all properties covered by this Agreement to discharge his or her duties as representative of the Union. No Employee may be called off his or her station by the Union representative without the Employer's consent, which consent shall not be unreasonably withheld; the Employer shall arrange to relieve the affected Employee upon the request of the Union representative.

**B. Bulletin Board:** The Employer shall make available to the Union in the nursing home a bulletin board for the purpose of posting Union notices.

## 7. SENIORITY/JOB PROTECTION

A.     1.     Any Employer shall have the right, for any reason which it deems advantageous in the business operation of its home, to lay off any Employees, provided, however, the Employer does not as a result of this layoff increase the proper work load of the other Employees.  In the event the Employer deems it advisable to lay off any Employees, seniority shall prevail in all such layoffs.  Seniority shall also prevail in the rehiring of Employees laid off. The foregoing shall be subject to the following:

2.     Employees employed by an Employer prior to January 1, 2000 shall be

4

protected against layoff. Effective as of May 1, 2008, Employees employed by an Employer prior to January 1, 2003, shall be protected from layoff. On or about May 1, 2010, the parties shall review (without being subject to arbitration) whether that date should be advanced. In the event an Employer raises a substantial issue over the number of its protected bargaining unit Employees (e.g., more than seventy-five (75%) percent of the Employees in a department or area are protected) the issue may be referred to a Committee made up of George Gresham, the President of the Union, and Michael Balboni, Esq., the Executive Director of the Association, or their designees, but shall not be subject to the arbitration process.

Unprotected Employees who are laid off are eligible for benefits from the Job Security Fund.

B.   In the event the Employer transfers an Employee covered by the employment guaranty to a lower rated position or reduces his or her hours, the Employee's base weekly salary will not be reduced during the term of this Agreement.  As applied to part-time Employees, this salary guarantee means that the Employee's annual actual hours, excluding overtime, shall not be reduced below such hours for the twelve (12) month period ending June 3, 2004 nor shall the Employee's current hourly rate, as modified by Article 12 Sections A through C be reduced.

C.   The Employer shall continue to have the right to train or retrain its Employees, including those covered by paragraph A above.

D.   On the question of permanent layoffs, the layoff of Employees shall be avoided and attrition relied upon instead so long as the occupancy rate remains constant.

E.   The length of service shall be computed from the date of commencement of continuous employment in the nursing home or the date of commencement of continuous employment with the Employer, whichever is longer. Seniority shall accrue only during paid leaves and not during unpaid leaves, except that seniority acquired prior to such unpaid leave shall not be forfeited. Seniority shall continue to accrue during military leaves and during unpaid leaves of absence due to prolonged illness of less than six (6) months duration, or for the period during which the Employee receives disability benefits, whichever is longer.

F.   In the event that the Employer is faced with a severe economic downturn placing the Employer in jeopardy of closing and requiring the reduction of its staff, the issue of appropriateness and number of layoffs, if not resolved by the parties, will be determined by the Impartial Chairman named in Article 9 of this Agreement in accordance with all of the procedures set forth therein. In such event, the laid off Employees shall be covered by all of the provisions of the Job Security Fund.

G.   When positions become available, they shall be filled in the following order:

1.      Part-time slotted/permanent workers shall first be offered additional or full time work in their classification, as such positions become available, in accordance with seniority.

2.      If the job opening is not filled by a part-time slotted/permanent worker, it shall be offered to a non-slotted/replacement Employee who has worked at least thirty (30) days during the six (6) month period immediately prior to the time that a position becomes available, based on seniority determined from the first day of employment with Employer. Where there is a gap of ninety (90) days or more between the time the non-slotted/replacement Employee last worked for the Employer and the date of his or her rehire (leave time excluded), then upon such rehiring the Employee shall be deemed a new Employee for the purpose of determining seniority rights.

H.   House seniority shall be applied to promotions and transfers, subject to being qualified to perform the job for which promotion or transfer is sought.

I.   Employment Service: Each Employer shall notify the 1199 Employment Service of all vacancies not filled from within its facility. The Employment Service shall have three (3) working days to refer qualified applicants to the Employer before the Employer may hire from other sources. The Employer retains the right to hire or decline to hire any applicant referred by the Employment Service in its sole discretion.

## 8. NO STRIKE OR LOCKOUT

No Employee shall engage in any strike, sit-down, sit-in, slow-down, boycott, interruption of work or other interference with the operations of the Employer.

The Union, its officers, agents, representatives and members shall not in any way, directly or indirectly, authorize, assist, encourage, participate in, or sanction, any strike, sit-down, sit-in, slow-down, boycott, interruption of work or other interference with the operations of the Employer, or ratify, condone, or lend support to any such conduct or action.

In addition to any other liability, remedy, or right provided by applicable law or statute, should a strike, sit down, sit in, slow down, boycott, interruption of work or other interference with the operations of the Employer occur, the Union shall immediately upon the request of the Employer:

publicly disavow such action by the Employees;

notify Employees of its disapproval of such action and instruct such Employees to cease such action and return to work at once.

The Employer agrees that it will not lock out covered Employees during the term of this Agreement.

6

## 9.    GRIEVANCE PROCEDURE

A.  All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any Employer, directly or indirectly, shall first be discussed with the Employer or its designee.

B.  In the event the complaint, dispute, controversy or grievance is not disposed of, it must be submitted in writing with reasonable specificity to the Employer within thirty (30) work days after the occurrence of the act giving rise to the grievance.  Grievances arising from overtime claims, Employee classification, claims, and/or matters relating to the Employee's classification, shall be presented within fifteen (15) months after the claim arose or after such claim should reasonably have become known, whichever is later.  Failure to give such notice within the time set forth herein shall be deemed a waiver of the right to submit the grievance to arbitration as hereinafter set forth.

The Impartial Chairman shall endeavor to hear discharge cases submitted to him within one (1) month from the date of submission and suspension cases within six (6) weeks from the date of submission.

C.  In the event any such complaint, dispute, controversy or grievance is not disposed of, it shall be submitted forthwith to the Impartial Chairman hereinafter named for arbitration and his decision shall be final and binding upon the parties hereto.  In the event of a willful default by any party in appearing before the Impartial Chairman, after due written notice shall have been given to the said party, the Impartial Chairman is hereby authorized to render a decision upon the testimony of the party appearing.

D.  The parties reappoint Martin F. Scheinman for a new five (5) year term, to November 15, 2015, as Impartial Chairman.  The Impartial Chairman may be removed during the term of this Agreement by Agreement of the parties and a substitute arbitrator may be added by mutual agreement.  Should the Impartial Chairman resign, refuse to act or be incapable of acting, or should the office become vacant for any reason whatsoever, the Association and the Union shall immediately and within five (5) days after the occurrence of such vacancy, designate another person to act as such Impartial Chairman or Impartial Chairwoman. If they fail to agree upon the designation, it shall be submitted to the New York State Employment Relations Board for its selection of a person to serve as Impartial Chairman or Impartial Chairwoman, and the parties hereto agree to accept its designation.

E.  The decision of the Impartial Chairman or other arbitrator must be rendered within thirty (30) days after the complete submission of the controversy or dispute to him or her and shall have the effect of a judgment entered upon an award made, as provided by the

7

arbitration provisions of the Civil Practice Law and Rules of the State of New York, entitling the entry of judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by the Decision.

The parties agree to use their best efforts to arbitrate as many grievances as feasible involving the same Employer on any scheduled arbitration date.

F. In the event of an emergency requiring immediate action, the parties agree that the Impartial Chairman may, upon request of the Union, an Employer, or the Association, or upon his own motion, call the parties to an arbitration hearing without regard to time limits otherwise applicable.

G. Fees paid to the Impartial Chairman or other arbitrator appointed hereunder shall be shared as follows: one-half (1/2) by the Association and one-half (1/2) by the Union.

The Impartial Chairman shall have the power to appoint, on an ad hoc basis, alternate or additional Impartial Chairmen or Impartial Chairwomen. If the parties jointly submit to him a panel of arbitrators, he shall appoint such additional or alternate arbitrators, or additional Impartial Chairmen or Impartial Chairwomen from among the arbitrators on such panel.

H. An Employer shall have the right, without first discharging an Employee, to a declaratory opinion of the Impartial Chairman as to whether the Employer is justified in discharging the Employee.

I. All discharge and indefinite suspension grievances must be heard within thirty (30) days of submission to the Impartial Chairman. If he does not schedule a hearing to be held within thirty (30) days the grievance shall be referred by the Impartial Chairman to an alternate arbitrator from a panel to be named by the parties.

J. No adjournment of discharge and indefinite suspension grievances shall be granted for a period of more than two (2) weeks; no second adjournment shall be granted except in extraordinary circumstances.

K. The Union and the Association shall continue to maintain a Joint Committee whose purpose is to seek mutual improvement of labor relations between the parties and undertake such activities as will aid the nursing home industry in relation to various governmental subdivisions. Such Committee shall have an equal number of representatives from the Union and the Association.

L. A warning notice shall not be issued without the prior knowledge of the Union Delegate and the reason therefor, and a copy of all warning notices issued shall be sent to the Union office by regular mail.

M. The Union shall have access to documents in personnel files which are reasonably related to the investigation of pending grievances and for use in arbitration.

8

N. The parties shall establish a special labor-management relations committee. The Committee shall develop policies and procedures regarding the conduct of labor relations between management and union representatives in a residential health care facility. If the Committee is unable to agree upon such policies and procedures, the Impartial Chairman shall issue rules that shall be binding on the parties.

O. The parties acknowledge their mutual interest in reducing the number of grievances pending before the date of this Agreement so as to timely implement the grievance and arbitration provisions of this Agreement. The parties therefore agree to hold special labor-management meetings in order to endeavor to reach settlements, where possible, of said pending grievances.

Special labor-management meetings shall be held solely for the negotiation of said grievances and shall be held within six (6) months of the execution of this Agreement, unless both sides agree to an adjournment. The grieving party shall present a full agenda of all grievances thirty (30) days prior to the date of a scheduled labor-management meeting. Such meetings will be held separately for each facility, at times and places to be determined by both parties. Such meetings shall be scheduled during working hours and/or during evenings and weekends. The parties and their representatives shall be present at the special labor-management meetings. No witnesses shall be heard at said meetings, unless by mutual consent of the parties, but documentary evidence may be presented and discussed. No statements made in such meetings shall be admissible in any subsequent arbitration, or other proceeding, by either party.

The parties hereby designate Martin F. Scheinman as the mediator who shall conduct said special labor-management meetings. The parties shall agree upon fees with the mediator, and such fees shall be shared equally by the parties.

Any matters not settled or withdrawn as a result of said special labor-management meetings shall be scheduled for arbitration pursuant to the relevant provisions of this Agreement. It is understood that the person who mediates the aforesaid disputes shall also be the arbitrator of such grievances in the event that a settlement is not reached and the matter proceeds to arbitration.

The mediator may be removed by agreement of the parties and a substitute mediator may be added by mutual agreement. An additional mediator may hereafter be named by mutual consent of the parties.

Nothing in this provision shall preclude discussion and/or negotiation of any grievance in any other forum, including labor-management meetings.

9

## 10.  WORK WEEK

A.  The regular work week shall be thirty five (35) hours consisting of five (5) consecutive work days in any week except where necessary to provide for rotating weekends off; the work day shall consist of seven (7) consecutive hours each day, excluding meal times. All hours worked in excess of seven (7) hours in any one (1) day or thirty-five (35) hours in any week shall be paid for at the rate of time and one-half (1-1/2) the regular hourly rate of pay.

B.  All time worked on either or both the sixth (6th) and seventh (7th) consecutive days shall be paid for at a rate of time and one-half (1-1/2) the regular hourly rate of pay, except where necessary to provide for rotating weekends off.

C.  No overtime shall be payable except for services specifically authorized by the Employer.

D.  Each Employee shall receive two (2) fifteen (15) minute breaks per shift.

E.  There shall be a ten (10) minute grace period before an Employee is docked for lateness, provided such privilege is not abused. It shall be considered an abuse of the privilege if an Employee is late twice by five (5) minutes or once (1) by ten (10) minutes in any thirty (30) day period. This privilege is not intended to condone frequent lateness of lesser amounts. Where an Employer, however, has a less stringent practice with regard to lateness, such practice shall continue. In no event shall any Employee be docked for more than his or her actual lateness.

## 11.  AGENCY EMPLOYEES, TEMPORARY EMPLOYEES, STAFFING SCHEDULES SLOTTED AND NON-SLOTTED EMPLOYEES (PERMANENT AND REPLACEMENT EMPLOYEES)

A.  Limiting Agency Workers

Each Employer is limited to the use of one (1) Agency Worker per vacant position, for a maximum of sixty (60) days, while the Employer seeks to recruit a regular worker for the position.

B.  Staffing Schedules 1.  Each Employer shall post in the facility a staffing schedule for all bargaining unit Employees with full and part-time slots. Such schedule shall cover the facility's complete staffing requirements (excluding supervisory and management personnel). Each employment slot shall be based upon a full year schedule. All bargaining unit work shall be performed only by slotted/permanent Employees except as provided below.[1]

---

[1]        The parties agree that all scheduling shall be in strict conformity with the practices and definitions set forth in this subparagraph notwithstanding any prior conflicting interpretation contained in any arbitration awards

10

2. Each Employer shall be required to schedule Employees on a twenty-eight (28) day schedule in the form attached hereto as Schedule "C" and shall provide the Union and the various Nursing Home Funds on a monthly basis with a complete and legible copy of each such twenty-eight (28) day schedule within ten (10) business days after the period covered by the schedule. Such submission shall be made without the necessity of a prior request by the Union.

3. In addition to the schedules described in paragraph 2, the Employers shall submit to the Union, on a monthly basis, copies of Fund remittance reports, with additional information provided in a format agreed to by the parties, showing the hours worked by each Employee, the total number of non-working benefit hours, the total number of replacement personnel hours, and the total hours worked by Agency Employees. In the event the parties are unable to agree on the format for such report within thirty (30) days following ratification of this Agreement, the matter shall be submitted to the Impartial Chairman for a final and binding determination.

C. Slotted Employees (Permanent Employees)

1. Any Employer which fails to fulfill the scheduling requirements, as described in subparagraph 11(B) above, including providing all requested schedules to the Union and the various 1199/SEIU Greater New York Funds, shall be deemed not to have implemented Article 11 of this Collective Bargaining Agreement and such provisions of Article 11 which are of benefit to the Employer shall not be applicable to such Employer.

2. No Employee's current schedule shall be reduced by the allocation of slots undertaken to implement this provision.

3. Slotted/permanent Employees are those who fill the employment slots.

4. Full-time slots for slotted/permanent Employees shall be those that consist of five (5) days per week on the slotting schedule.

5. Part-time slots for slotted/permanent Employees shall be those that consist of fewer than five (5) days on the slotting schedule.

6. Slotted/permanent part-time Employees shall receive the following benefits:

Employers shall make Funds contributions on behalf of slotted part-time Employees who work one (1) day or more per week. The Employers shall provide pro-rata benefits.

---

or other determinations by prior arbitrators of any of the terms or definitions used herein.

Contributions to the Funds shall be waived for part-time Employees working less than one (1) day per week who receive the ten (10%) percent premium above the regular hourly rate of pay for full-time Employees in their classification.

7. Each Employer covered by this Agreement shall be required to employ one (1) slotted/permanent replacement Employee for each one hundred (100) beds in its facility, up to a maximum of two (2) such Employees. Facilities with less than sixty (60) beds shall comply with this provision on a pro rata basis. These permanent replacement Employees shall be employed on a regular basis substituting for slotted/permanent Employees during their absence on non-working benefit days (leave, holidays, personal days or vacation) and shall be covered by all of the terms and conditions of this Agreement.

D. Non-Slotted Employees (Replacement Employees)

1. Non-slotted/replacement Employees are those persons who only substitute for slotted/permanent Employees during their absence on non-working benefit days (leave, holidays, personal days or vacation).

2. Non-slotted/replacement Employees shall not be subject to the terms and benefits of this Agreement except as follows and as otherwise provided for in this Agreement:

The non-slotted/replacement Employees shall be subject to the union security provisions of this contract.

The Employer will not be required to make contributions to the Funds on behalf of non-slotted/replacement Employees who work less than eight hundred and fifty (850) hours as specified pursuant to the Trust Indenture of 1199/SEIU Greater New York Pension Fund in a calendar year. In the event that the total gross payroll for non-slotted/replacement Employees exceeds twenty (20%) percent of the total gross annual payroll of the facility, the Employer shall be required to make contributions on that amount exceeding twenty (20%) percent of the gross bargaining unit payroll.

Upon the completion of thirty (30) working days of employment with an Employer, a non-slotted/replacement Employee shall be eligible for health coverage, and, anything above to the contrary

12

notwithstanding, the Employer shall remit contributions to the Benefit Fund as follows:

Commencing the month after the completion of thirty (30) working days, contributions shall be remitted on behalf of all non-slotted/replacement Employees who work eleven (11) or more days per month and for each month thereafter in which they perform said services as aforesaid.

3. In addition to such other benefits provided herein and under the Collective Bargaining Agreement which are applicable to non-slotted/replacement Employees, after thirty (30) days of employment, each non-slotted/replacement Employee shall receive an increase in his or her hourly wage equal to ten dollars ($10.00) per week. In addition, the check-off authorization and uniform allowance provisions of the Collective Bargaining Agreement shall apply to non-slotted/replacement Employees. The uniform allowance shall be paid to non-slotted replacement Employees on the basis of time worked.

E. Expedited Arbitration Procedures for Systemic Slotting Grievances

Any claimed systemic slotting violation arising under the Slotting provisions of this Agreement ("slotting grievance") may be brought by any of the parties hereto to expedited arbitration. Expedited arbitration of such disputes shall be conducted as set forth herein when the written demand for arbitration designates it as a systemic slotting grievance. If the demand for arbitration does not include that designation, the matter shall be heard by the parties' Impartial Chairperson, pursuant to the grievance arbitration procedures set forth in the Agreement as herein modified. The grieving party shall provide the other party with copies of all documentation upon which it intends to rely in support of its claim at the expedited arbitration at the time it files its demand for expedited arbitration pursuant to the rights contained in this Article.

The expedited arbitrations relating to systemic slotting grievances shall be submitted to the Impartial Chairman. The parties shall agree upon fees with the Impartial Chairman, and such fees shall be shared equally by the parties.

The Impartial Chairman shall conduct a hearing on a systemic slotting grievance within twenty (20) working days of receipt of the grieving party's demand for arbitration in said matter, unless both parties agree to an adjournment of the hearing or the arbitrator finds good cause for granting an adjournment requested by either party. In the event the arbitrator grants an adjournment requested by either party, said adjournment shall, to the extent possible, be for no more than ten (10) working days. At the conclusion of the hearing, the arbitrator shall issue a written decision within ten (10) working days.

13

F. <u>Industry Committee:</u>     The parties shall establish an Industry committee to address systemic abuses regarding the use of non-slotted Employees.

## 12.  WAGE INCREASES

A.    Effective December 1, 2011, Employees in covered classifications shall receive a two and one quarter (2.25%) percent increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

B.    Effective December 1, 2012, Employees in covered classifications shall receive a two and one half (2.5%) percent increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

C.    Effective December 1, 2013, Employees in covered classifications shall receive a two and one half (2.5%) percent increase in wages or be paid the minimum rate for their classification as set forth in Schedule B, whichever is greater.

D.    For non-parity facilities, the wage increases referred to in (A) through (C) above shall be calculated on the Master Facility wage base and shall be added to the minimum rates at such non-parity facilities.

E.    The wage increases referred to in (A) through (C) above shall be compounded and added to the minimums.  (See Schedule B).

F.    The parties have agreed to the minimums set forth in Schedule B.  No Employee shall receive less than the minimum for his or her job classification.

G.    1.    Full-time Employees in covered classifications, on the payroll on January 31, 2011, shall receive a lump sum payment in the sum of one hundred and fifty ($150) dollars, less applicable taxes.  Non-Probationary, Part-time Employees shall receive a pro-rated lump sum payment based on the hours paid during the 12-month calendar period immediately preceding January 31, 2011. The lump sum payment shall be paid in a single separate check.

2.    Full-time Employees in covered classifications, on the payroll on September 30, 2011, shall receive a lump sum payment in the sum of one hundred ($100) dollars, less applicable taxes. Non-probationary Part-time Employees shall receive a pro-rated lump sum payment based on the hours paid during the twelve (12) month calendar period immediately preceding September 30, 2011. The lump sum payment shall be paid in a single separate check.

H.    Nothing herein contained shall prevent an Employer from giving additional merit increases, bonuses or other similar payments as it shall desire.

14

## 13.  MINIMUM RATES OF PAY/LONGEVITY PAY/EXPERIENCE RATES

A.  The minimum rates of pay for each classification are attached to this Agreement as Schedule "B" and made part of this Agreement as if they were fully and at length set forth herein.

B.  All Employees who have completed four (4) years or more but less than eight (8) years of substantially continuous employment shall receive one dollar ($1.00) per week on the effective date of each annual increase provided herein. All Employees who have completed eight (8) years or more but less than ten (10) years of substantially continuous employment shall receive two dollars ($2.00) per week on the effective date of each annual increase provided herein. All Employees who have completed ten (10) years or more of substantially continuous employment shall receive three dollars ($3.00) per week on the effective date of each annual increase provided herein. "Annual" for the purposes of this paragraph shall be defined to mean January 1st in each contract year.  The longevity pay provided herein shall be noncumulative.

C.  The following yearly experience rates shall be effective for in-house experience as an LPN on the Employee's appropriate anniversary date (pro-rated for part-time Employees):

| | |
|---|---|
| 2 years | $500.00 |
| 4 years | $800.00 |
| 6 years | $1,200.00 |
| 10 years | $2,000.00 |
| 15 years | $2,350.00 |
| 20 years | $3,000.00 |

The payments specified above shall be paid as lump sums until April 30, 2005.  Beginning April 30, 2005, these experience step payments shall become part of the base wage (calculated on an hourly basis) of each eligible LPN for all purposes.

Any Employer which currently provides a better total compensation benefit (base rates plus experience steps) shall continue to provide this greater total compensation.

D.  Wages are to be paid to the Employees in cash each and every week. However, where mutually agreed upon between the Union and the Employer, payments may be made by check. Accompanying all pay shall be an itemized list of deductions.

## 14. SHIFT DIFFERENTIAL

All Employees regularly assigned to a shift commencing before 6:00 a.m. or ending after 7:00 p.m. shall receive a shift differential of ten (10%) percent additional to their regular rate of pay, except that anyone commencing before 6:00 a.m. but not earlier than 5:00 a.m. shall receive a shift differential of two (2) hours and anyone whose shift terminates after 7:00 p.m. shall be entitled to a shift differential for all hours after 3:00 p.m.

## 15. MEALS

The Employers shall continue to furnish a hot meal to each Employee each day consisting of beverage, soup or salad, meat, poultry or fish, two (2) vegetables, a dessert or fruit. Meals shall be served under healthful and hygienic conditions. The failure, refusal or omission of an Employer to provide the required meal, shall constitute sufficient grounds to support the claim of affected Employees for payment in lieu thereof at the rate of two dollars ($2.00) per meal.

## 16. HOLIDAYS

A. All Employees covered by this Agreement shall receive the following holidays with pay:

| | |
|---|---|
| New Year's Day | Independence Day |
| Martin Luther King's Birthday | Labor Day |
| Lincoln's Birthday | Thanksgiving Day |
| Washington's Birthday | Christmas Day |
| L.P.N. Day (May 1st) | Two (2) Personal Days |
| Decoration Day | Employee's Birthday |

LPNs hired before July 5, 2007 are eligible for LPN Day. The date of an Employee's birthday as set forth on his or her application for employment shall be conclusive upon the Employer.

B. To be eligible for personal days, Employees shall have worked three (3) substantially continuous months in each year of their employment. Except where by mutual consent it is otherwise agreed, Employees shall give the Employer one (1) weeks notice of their desire to take their personal day, except in the case of emergency.

C. All leap-year birthday Employees shall have an equivalent day off each year. Where a holiday falls within a vacation week, or on an Employee's birthday, the Employee shall be entitled to pay for the holiday.

16

D. Employees shall be notified by their respective Employers five (5) days in advance in the event the said Employer requires such Employee or Employees to work on the holiday.

E. An Employee required to work on any of the following "legal" holidays shall be paid at the rate of time and one-half (1-1/2) his or her regular hourly rate for all hours worked on these holidays and shall, in addition, be paid a day's pay at his or her regular straight time rate as holiday pay:

New Year's Day
Martin Luther King's Birthday
Washington's Birthday
Decoration Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

F. An Employee required to work on any holiday other than those specified as "legal" holidays shall receive his or her regular straight time pay in addition to the holiday pay. Employees hired solely as holiday replacements shall receive only their regular straight time pay.

G. Where a holiday falls on Sunday, it shall be observed on the following Monday. Where the State and Federal Governments have established different days for the celebration of the same holiday, and where one of those days results in the holiday being celebrated on Monday and the other does not, the one which results in a Monday celebration shall be the one which is applicable hereunder.

## 17. VACATIONS

A. All Employees who complete six (6) months of substantially continuous employment shall, upon the completion of such six (6) months, receive one and one-half (1-1/2) weeks vacation with pay.

B. All Employees who have completed the second six (6) months of substantially continuous employment shall receive an additional one and one-half (1-1/2) weeks of vacation with pay.

C. All Employees who have completed one (1) year but less than four (4) years of substantially continuous employment shall receive three (3) weeks of vacation with pay.

D. All Employees who have completed four (4) years but less than six (6) years of substantially continuous employment shall receive four (4) weeks of vacation with pay.

17

E.  Employees who have completed six (6) years or more of substantially continuous employment shall become entitled to five (5) weeks of vacation with pay for each year of service thereafter.

F.  Vacation assignments shall be made by the Employer to insure the orderly and efficient continuation of patient care. The Employer agrees to give the desired vacation time indicated by the Employee, in order of seniority.

G.  If any Employee's employment terminates for any reason whatsoever after he or she has been substantially continuously employed six (6) months or more, he or she shall receive pro rata vacation pay.

H.  Vacation pay shall be paid in cash on the last regularly scheduled working day prior to such vacation.

I.  Employees hired after July 5, 2007, shall receive paid vacation as provided under the League Agreement.  Nothing herein shall require an Employer to increase the amount of paid vacation it provides.

## 18.  LEAVES

A.  Sick Leave

A doctor's note will not be required for absences of less than three (3) days, unless a pattern of abuse of the sick leave provisions of this Agreement can be shown.  Paid sick leave may be utilized for the care of children or other immediate family members of covered Employees.

Each Employee shall be entitled to receive paid sick leave as follows:

1.  Eighteen (18) days per year accruing at the rate of one and one-half (1-1/2) days per month.  Effective January 1, 2008, Employees may accrue up to fifteen (15) sick leave days.

2.  Unused sick days up to fifteen (15) days will be paid out or banked at the sole option of the Employee.

3.  Unused banked sick days (whether accrued before or after January 1, 2008) will be paid out upon retirement at the rate of pay in effect at the time of retirement, except that unused sick days banked prior to January 1, 2008, at the sole option of the Employees, may be taken as additional sick days in any year. Upon retirement, all banked sick days, as well as the sick day entitlement in the year of retirement, shall be paid at the then applicable rate.

4.  Unused sick leave (except as provided in Paragraph 3 above) shall be paid to Employees at least one (1) week prior to Christmas time in each year except that in the year this Agreement terminates or upon termination of employment for any reason

18

whatsoever, it shall be paid on such termination date.  Sick leave shall be paid for at the rate prevailing at the time of accrual.

5. In the event that an Employer fails to pay sick leave pay when due, the Union may take such matter to arbitration and the Impartial Chairman in addition to granting such other relief as he may deem appropriate in the premises, shall be empowered to direct such Employer thereafter to set aside unused sick leave pay, on a monthly basis, in a separate account, established for that purpose by the Employer.

B. Leave of Absence

Any Employee becoming ill shall be entitled to a leave of absence for any illness lasting up to one (1) year, with the Employer entitled to notification and verification if requested and said Employee shall be entitled to reinstatement without loss of seniority. Any Employee injured upon the job shall be reinstated upon recovery without loss of seniority or other benefits provided herein.

C. Maternity Leave

Leaves of absence shall be granted for pregnancy for a period of up to ten (10) months commencing as of the time the pregnant Employee leaves her employment and the said Employee shall be entitled to reinstatement at the conclusion of such leave without loss of seniority. An Employee must inform the Employer as soon as she learns of her pregnancy.

D. Bereavement Leave

In the event of death of an Employee's parent, brother, sister, mother-in-law or father-in-law, grandparents, legal guardians if reared by such or grandchild, said Employee shall be entitled to three (3) days of paid leave; in the event of the death of the Employee's spouse or child, said Employee shall be entitled to five (5) days of paid leave. Such leave shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

E. Paternity Leave

In the event an Employee's spouse gives birth to a child, then the Employee shall be entitled to three (3) days of paid leave. Such leave shall be effective only after said Employee has completed this thirty (30) day probationary period.

F. Leave for Marriage

In the event an Employee marries, the Employee shall be entitled to three (3) days of paid leave. Such leave shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

G. Leave for Jury Duty

Employees called for jury duty shall be paid the difference between their regular pay and the amount they receive as jury pay. Employees regularly employed on the morning shift shall also receive their regular rate of pay for actual time lost in qualifying for jury duty;

19

Employees regularly employed on the afternoon shift shall receive up to two (2) hours pay for time lost from work while qualifying for jury duty computed from the time they are excused from court. Such benefit shall be effective only after said Employee has completed his or her thirty (30) day probationary period.

H. Educational Leave

Employees covered by the Collective Bargaining Agreement who wish to undertake the schooling required to qualify for a higher paying position, such as, but not limited to Registered Nurses, Licensed Practical Nurses, Licensed Engineers and Dietitians, shall be granted a leave of absence for not more than eighteen (18) months to complete such schooling and, upon proof of satisfactory completion thereof, shall be granted preferential hiring rights in the classification in which such Employee is then qualified.

## 19. UNIFORMS

The Employer shall furnish and maintain all uniforms of Employees, except that where an Employee furnishes and maintains his or her own uniform such Employee shall receive an allowance of two dollars and fifty cents ($2.50) per week. Where an Employer has been furnishing and maintaining uniforms, it shall continue to do so unless the practice is changed by mutual consent. No deduction shall be made from the uniform allowance on account of illness, unless the Employee is absent for an entire week.

## 20. MAINTENANCE OF STANDARDS

A. No Employer shall lower any standards of wages, hours or working conditions prevailing in its establishment as a result of this Agreement.

B. No Employee will be transferred to a shift other than that for which said Employee was hired, except by mutual consent. There shall be no change in schedules except upon five (5) days' notice to the Union or by mutual consent.

## 21. DISABILITY BENEFITS

The Employers shall provide statutory disability coverage and shall pay the Employee contribution to state-mandated disability coverage, which is currently sixty cents ($.60) per week.

## 22. MISCELLANEOUS EMPLOYEE BENEFITS

A. The parties agree to the principle that efforts shall be made to provide Employees with rotating weekends off if they request the same, it being the intention to achieve alternate weekend duty while maintaining the privilege of seniority with respect to choice of working

20

days. To facilitate the desired scheduling, the word "weekend" for these purposes shall be defined as "Saturday and Sunday" or "Sunday and Monday."

B. Each Employee in the bargaining unit shall receive two dollars and fifty cents ($2.50) per week toward his or her cost of transportation, prorated, however, in accordance with actual days worked.

C. Nurses performing on two (2) floors or more than one (1) station because the regularly scheduled nurse or replacement fails to report for duty shall receive two (2) extra hours of pay at a rate of time and one-half (1/2) the regular hourly rate of pay.

## 23. BENEFIT FUND

A. The Association and the Union shall continue to maintain a Benefit Fund, known as the 1199/SEIU Greater New York Benefit Fund for their Employees and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employer shall be used by the 1199/SEIU Greater New York Benefit Fund solely for those fringe benefits set forth in the Trust Agreement heretofore executed and thereafter amended establishing such 1199/SEIU Greater New York Benefit Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies if any, insuring the Employees.

E. The parties understand that the 1199/SEIU Greater New York Benefit Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

21

## 24.  PENSION FUND

A.  The Association and the Union shall continue to maintain a Pension Fund, known as the 1199/SEIU Greater New York Pension Fund, for their Employees and each Employer shall make contributions thereto for each of his Employees covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of bargaining unit Employees for whom contributions are required.  "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B.  Such contributions shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement.  In the event the Employer, without justification fails to promptly remit such monies, the Impartial Chairman can, upon application, assess interest at the legal rate against the Employer.

C.  The payments so made by the Employers shall be used by the 1199/SEIU Greater New York Pension Fund solely for those benefits set forth in the Trust Agreement executed hereunder and thereafter amended establishing such 1199/SEIU Greater New York Pension Fund.

D.  The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records of bargaining unit Employees that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E.  The parties understand that the 1199/SEIU Greater New York Pension Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, as the same from time to time might be amended, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 25.  EDUCATION FUND

A.  The Association and the Union shall continue to maintain an Education Fund, known as the 1199/SEIU Greater New York Education Fund, for their Employees and each Employer shall make contributions thereto for each of his Employees covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of bargaining unit Employees for whom contributions are required.  "Gross payroll" for the purpose of this provision shall be

22

defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B.   Such contributions shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement.  In the event the Employer, without justification fails to promptly remit such monies, the Impartial Chairman can, upon application, assess interest at the legal rate against the Employer.

C.   The payments so made by the Employers shall be used by the 1199/SEIU Greater New York Education Fund solely for those benefits set forth in the Trust Agreement executed hereunder and thereafter amended establishing such 1199/SEIU Greater New York Education Fund.

D.   The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records of bargaining unit Employees that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E.   The parties understand that the 1199 SEIU Greater New York Education Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, as the same from time to time might be amended, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund.  The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 26.  JOB SECURITY FUND

A.   The Association and the Union shall establish and maintain a Job Security Fund, known as the 1199/SEIU Greater New York Job Security Fund, for their Employees and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required.  "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B.   Such contributions shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

23

C. The payments so made by the Employer shall be used by 1199/SEIU Greater New York Job Security Fund solely for those fringe benefits set forth in the Trust Agreement heretofore executed and thereafter amended establishing such 1199/SEIU Greater New York Job Security Fund.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies if any, insuring the Employees.

E. The parties understand that the 1199/SEIU Greater New York Job Security Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 27. WORKER PARTICIPATION FUND

A. The Association and the Union shall continue to maintain a Participation Fund, known as the 1199/SEIU Greater New York Worker Participation Fund, and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required. "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B. Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C. The payments so made by the Employer shall be used by the 1199 SEIU Greater New York Worker Participation Fund solely for those purposes set forth in the documents heretofore executed and thereafter amended establishing such 1199/SEIU Greater New York Worker Participation Fund, Inc.

D. The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and

agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies if any, insuring the Employees.

E.  The parties understand that the 1199SEIU/Greater New York Worker Participation Fund will be held and managed under the terms and provisions of a Certificate of Incorporation and By-Laws executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 27A. GREATER NEW YORK WORKER PARTICIPATION/LONG TERM CARE ADVOCACY PROJECT (GNYWPF/LTCAP)

A.  Effective January 1, 2009, there shall be established a new fund, known as the 1199SEIU Greater New York Worker Participation/Long Term Care Advocacy Project (GNY WPF/LTCAP), which shall serve as an Education Project on behalf of the long term care industry. The purpose of this Project is to enhance the level of cooperation and partnership between the parties to ensure the interests of the Union, the Employers and the Employees who work in the long term care industry, while at the same time helping to improve the quality of care received by residents. The funding for this Project shall be by Employer contribution of one quarter (0.25%) percent of gross payroll. This Project shall be structured in the same manner as the other 1199/SEIU Greater New York Funds, including the methodology for resolving disputes.

B.  Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C.  The payments so made by the Employer shall be used by the GNY WPF/LTCAP, solely for those purposes set forth in the documents heretofore executed and thereafter amended establishing such GNY WPF/LTCAP.

D.  The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies, if any, insuring the Employees.

E.  The parties understand that the GNY WPF/LTCAP, will be held and managed under the terms and provisions of a Certificate of Incorporation and By-laws executed in connection with the said Fund, copies of which are on file with the Association and the Union,

25

and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the programs provided.

## 28.   CHILD CARE FUND

A.  The Association and the Union shall establish and maintain a Child Care Fund, known as the 1199/SEIU Greater New York Child Care Fund, for their Employees and each Employer shall make contributions thereto for each Employee covered by this Agreement in the percentages set forth below in Article 29 of the gross payroll of all bargaining unit Employees, for whom contributions are required.  "Gross payroll" for the purpose of this provision shall be defined to exclude payment for unused sick days, uniforms, transportation allowance and meals.

B.  Such contribution shall be paid by each Employer on or before the tenth day of each month and shall cover the previous month's Employees covered by this Agreement. In the event the Employer, without justification, fails to promptly remit such monies, the Impartial Chairman may, upon application, assess interest at the legal rate against the Employer.

C.  The payments so made by the Employer shall be used by the 1199/SEIU Greater New York Child Care Fund solely for those fringe benefits set forth in the Trust Agreement heretofore executed and thereafter amended establishing such 1199/SEIU Greater New York Child Care Fund.

D.  The Employer shall furnish to the Union monthly a statement indicating the names of the Employees covered by this Agreement, their social security numbers and the amount of wages paid, or such other report, record or statement as shall supply such information, and agree to make available for inspection to the Trustees of the Fund all payroll records that may be required for the sound and efficient operation of the Fund, or which may be required by the insurance companies if any, insuring the Employees.

E.  The parties understand that the 1199/SEIU Greater New York Child Care Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust executed in connection with the said Fund, copies of which are on file with the Association and the Union, and the Employers, although they may have the right to do so, shall be under no obligation to see to the application of monies paid to the Fund. The Fund shall submit annually to the Association and to the Union a report respecting the application of the monies received by it and the benefits paid.

## 29.  FUND CONTRIBUTIONS AND CONTRIBUTION RATES

A. The Employers shall contribute the percentages set forth below of "gross payroll" as that term is defined in the Benefit, Pension, Education, Job Security, Worker Participation Child Care Fund and Long Term Care Advocacy Project provisions of this Agreement, for each Employee for whom contributions are required to such Funds.

B. The Employers shall make Funds contributions on behalf of slotted part-time Employees who work one (1) days per week or more, so that such Employees shall be able to receive part-timer benefits as developed by the Trustees of the Funds.

C. It is the agreement of the Association, the Union, and the Funds to implement, wherever possible, electronic transmission of Fund contributions and reports and to streamline reporting requirements. The Association, the Union, and the Funds will meet to discuss the most practicable implementation program to achieve this objective.

D. The rate of contribution to the Benefit Fund shall be as follows:

1. The Employers shall contribute to the 1199SEIU Greater New York Benefit Fund at the percentage rates of gross payroll provided below, subject to section 3(li)-(ix) of this Article.

| Benefit Fund Contributions | | |
| --- | --- | --- |
| Effective Date | Minimum | Master |
| January 1, 2009 | 22.75% | 24.50% |
| February 1, 2011 | 26.90% | 28.65% |
| January 1, 2012 | 24.90% | 26.65% |
| June 1, 2012 | 25.90% | 27.65% |
| April 1, 2013 | 27.90% | 29.65% |
| June 1, 2013 | 28.90% | 30.65% |

Employers contributing to the Benefit Fund at the Minimum or Master rates (or at rates between the Minimum or Master rates) shall continue to contribute at such rates except as may be adjusted in the following paragraphs.

The above contribution rates will be adjusted by the Trustees as necessary to maintain the level of benefits currently provided, or as improved by the Trustees during the life of this Agreement, and to provide for a one (1) month reserve. In the event the Trustees determine, upon advice of the Fund's actuary, that additional contributions are required to maintain the current level of benefits and provide for a one (1) month reserve, the percentage rate of contribution to the Fund shall be increased as the Trustees determine to be necessary.

27

In the event the Trustees cannot agree on any such adjustment, the proper rate of contribution shall be set by the Impartial Chairman.

     2. Lump Sum Payments to the Benefit Fund

     i)  The Employers shall contribute an additional four (4%) percent of gross bargaining unit payroll to the Benefit Fund in each of the following months: March 2014 and April 2014.

     ii)  On March 1, 2012, the Employers shall contribute $295 per full-time bargaining unit employee ($177 per part-time employee) to the Benefit Fund.

     E.  The rate of contribution to the Pension Fund shall be as follows:

     1. The Employers shall contribute to the 1199/SEIU Greater New York Pension Fund at the rate of five and eighty-four one hundredths (5.84%) percent of gross payroll.  Thereafter, the parties shall adjust the contribution rate based on the advice of the Pension Fund Actuary necessary to fund benefits provided by the plan or as improved hereunder.  In the event of any dispute as to the proper contribution rate, the Impartial Chairman shall resolve such dispute.

     2. Minimum Pension Fund Contributions

     i)  Effective January 1, 2008, the minimum rate of contribution to the Pension Fund is three (3%) percent of gross payroll.  Effective February 1, 2010 the minimum rate of contribution to the Pension Fund shall be three and one-half (3.5%) percent of gross payroll.  All Employers contributing above the minimum rate of contribution but below the five and eighty-four one hundredths (5.84%) percent Master Rate of contribution shall increase their contribution to the minimum rate or by one quarter (0.25%) percent effective January 1, 2008 and an additional one quarter (0.25%) percent as of January 1, 2010. Effective January 1, 2011 Employers contributing at a rate less than nine (9.00%) percent shall increase their contribution rate by three and forty-one hundredths (3.41%) percentage points. Effective January 1, 2012, 2013 and 2014 Employers contributing at a rate of less than nine (9.00%) percent shall increase their contribution rate by one quarter (0.25%) percentage points) (provided the rate does not exceed the master rate in the chart in section (ii) below).

     ii)  The parties agree to adopt the Preferred Schedule (Attachment D) as part of this Agreement. Pension contribution rates shall be as follows (see chart below):

| Pension Contribution Rates | | |
| --- | --- | --- |
| Effective Date | Minimum Rate | Master Rate |
| February 1, 2007 January 1, 2008 | 3.00% | 5.84% |
| February 1, 2010 | 3.5% | 5.84% |
| January 1, 2011 | 6.91% | 9.00% |

| January 1, 2012 | 7.16% | 9.00% |
| January 1, 2013 | 7.41% | 9.00% |
| January 1, 2014 | 7.66% | 9.00% |
| September 1, 2014 | 9.10% | 9.10% |

### 3) Diversions, Suspensions and Additional Contributions

i) Contributions to the Benefit Fund and Pension Fund shall be allocated by the parties each year, with the advice of the Benefit Fund and Pension Fund actuaries, so as to (1) fund the level of benefits in the Benefit Fund and a one (1) month reserve, (2) meet minimum funding standards in the Pension Fund, (3) fund the current level of Pension Fund benefits, (4) fund the increase to 27 years in the number of pension credits that participants may accrue in the Pension Fund, and (5) satisfy applicable federal statutes and regulations. Because no pension credits will be accrued in 2008 and 2009, it has been estimated by the actuaries that in each of these years 4 to 5 months of Employer contributions at the Employers' Pension Fund contribution rate will be required to be made to the Pension Fund and 7 to 8 months to the Benefit Fund, in addition to the Employers' contributions to the Benefit Fund at their Benefit Fund contribution rate.

ii) All Employers who comply with Article 12A shall receive a moratorium of two (2%) percent of their required contribution to the Benefit Fund for the period January 1, 2012, through September 30, 2012, and, effective October 1, 2012, Employers shall be obligated to pay the full amount of the Benefit Fund contribution rate due under the Collective Bargaining Agreements and Awards without regard to the two (2%) percent Moratorium.

iii) In addition to the relief in 3ii above, for all Employers who comply with Art. 12 A, the relief provided in the Supplemental Arbitration Award of July 14, 2011, temporarily suspending the implementation of a one (1%) percent increase in the contribution rate payable to the Benefit Fund as of June 1, 2011, shall continue.

iv) For all Employers who do not comply with Article 12 A, the relief provided in 3ii above, shall not be automatically available and the relief provided in 3iii, above, shall cease as of December 1, 2011.

v) Employers that do not comply with Article 12 A, but continue to assert a claim under the Subject to Reimbursement Clause (Article 38) of their Collective Bargaining

Agreement shall have the burden in accordance with such clause to establish inadequate reimbursement. If successful in such claim, an Employer shall receive only the relief to which it has established individual entitlement, if any. Unlike Employers complying with Article 12A, it shall not automatically be entitled to the relief provided in 3ii and 3iii above. If an Employer pursues a subject to reimbursement claim under Article 38 but is unsuccessful, it will be responsible for all of the costs associated with the proceeding in accordance with Article 38.

vi) For all Employers who comply with Article 12A and B, the Moratorium of two (2%) percent of their required contribution to the Benefit Fund shall be extended six (6) months, from September 30, 2012, to March 31, 2013, and accordingly effective April 1, 2013, Employers shall be obligated to pay the full amount of the Benefit Fund contribution rate due under the Collective Bargaining Agreements and Awards without regard to the two (2%) percent Moratorium.

vii) In addition to the relief in 3ii above for all Employers who comply with Article 12A and B, the relief provided in the Arbitration Award of July 14, 2011, suspending the implementation of a one (1%) percent increase in the contribution rate payable to the Benefit Fund as of June 1, 2011, shall continue.

viii) For all Employers who do not comply with Article 12A and B the relief provided in 3ii above, shall not be automatically available and the relief provided in 3viii above, shall cease as of December 1, 2012.

Employers that do not comply with Article 12A and B but continue to assert a claim under the Subject to Reimbursement Clause (Article 38) of their Collective Bargaining Agreements shall have the burden in accordance with such clause to establish inadequate reimbursement. If successful in such claim, an Employer shall receive only the relief to which it has established individual entitlement, if any. Unlike Employers complying with Article 12A and B, it shall not automatically be entitled to the relief provided in 3vi and 3vii above. If an Employer pursues a subject to reimbursement claim under Article 38 but is unsuccessful, it will be responsible for all of the costs associated with the proceeding in accordance with Article 38.

F.  The rate of contribution to the Education Fund shall be as follows:

1)    The Employers shall continue to contribute to the 1199/SEIU Greater New York Education Fund at the rate of one-half (.5%) percent of gross payroll, as defined in paragraph 25 of this Agreement.

2)    There shall be a moratorium for contributions to the 1199SEIU GNY Education Fund for calendar year 2009.

3)    Employers bound to the terms of the May 31, 2009 and December 13, 2010 Interest Arbitration Awards shall not be obligated to make contributions to 1199/SEIU Greater New York Education Fund for the period January 1, 2012-March 31, 2012.

G.  The rate of contribution to the Child Care Fund shall be as follows:

1)    The Employers shall contribute to the 1199/SEIU Greater New York Child Care Fund at one-half (.5%) percent of gross payroll, as defined in paragraph 28 of this Agreement.

2)    There shall be a moratorium for contributions to the 1199SEIU GNY Child Care Fund for calendar year 2009.

H.  The rate of contribution to the Job Security Fund shall be as follows:

1)    The Employers shall contribute to the 1199/SEIU Greater New York Job Security Fund at the rate of one-quarter (0.25%) percent of gross payroll, as defined in paragraph 26 of this Agreement.

2)    There shall be a moratorium for contributions to the 1199SEIU GNY Job Security Fund for calendar year 2009.

3)    Contributions at the rate of one-quarter (0.25%) percent of gross payroll payable under the Collective Bargaining Agreements to the 1199/SEIU Greater New York Job Security Fund shall be paid instead to the 1199/SEIU Greater New York Benefit Fund for the twelve (12) month period commencing March 1, 2010.

4)    Employers bound to the terms of the May 31, 2009 and December 13, 2010 Interest Arbitration Awards shall not be obligated to make contributions to 1199/SEIU Greater New York Job Security Fund for the period January 1, 2013-December 31, 2013.

I.  The rate of contribution to the Worker Participation Fund shall be as follows:

1)    The Employers shall contribute to the 1199/SEIU Worker Participation Fund Inc. at the rate of one-quarter (0.25%) percent of gross payroll, as defined in paragraph 27 of this Agreement.

2)    Contributions at the rate of one-quarter (0.25%) percent of gross payroll payable under the Collective Bargaining Agreements to the 1199/SEIU Greater New York Job Worker Participation Fund shall be paid instead to the 1199/SEIU Greater New York Benefit Fund for the twelve (12) month period commencing March 1, 2010.

31

3) Employers bound to the terms of the May 31, 2009 and December 13, 2010 Interest Arbitration Awards shall not be obligated to make contributions to 1199/SEIU Greater New York Worker Participation Fund for the period June 1, 2011-December 31, 2011.

J. 1) The rate of contribution to the Long Term Care Advocacy Project (LTCAP) shall be as follows: one quarter (0.25%) percent of gross payroll.

2) Employers bound to the terms of the May 31, 2009 and December 13, 2010 Interest Arbitration Awards shall not be obligated to make contributions to 1199/SEIU Greater New York Worker Participation Fund/Long Term Care Advocacy Project for the period June 1, 2011-October 31, 2011.

K. 1) The Employers must commence making contributions to the Benefit and Pension Funds on behalf of new Employees upon the sixtieth (60th) day after the date of hire of such Employees. Thereafter, if any Employee subsequent to the probationary period, works one (1) week in a reporting month, the Employer must make contributions to the Funds on his or her behalf based on his or her entire gross pay for the reporting month.

2) For Employees hired on or after June 1, 2009, Employers shall not be required to make contributions to the Education, Child Care Fund, Job Security Fund, Worker Participation Fund and Long Term Care Advocacy Project until after six (6) calendar months.

L. Exclusions from Bargaining Unit

For the purposes of defining "gross payroll", the following job classifications shall be excluded:

(a) Administrator and assistant, if any.

(b) Director of Nursing Services.

(c) Consultant Dietitian.

(d) Controller or Headbookkeeper, where there is no Controller; Controller and Headbookkeeper; Headbookkeeper and Assistant Bookkeeper, if any.

(e) One confidential secretary (who spends the greater part of her time working with administration).

(f) Physical and Occupational Therapists.

32

(g)    Executive Housekeeper (performs no floor work).

(h)    In-service Training Nurse (performs no floor work).

(i)    Consortium Trainees (until they are placed on staff).

(j)    Guard.

(k)    Social Workers (except as otherwise provided in Schedule "B").

M.  In the event a dispute arises in connection with the failure of an Employer to make the required contributions to the various 1199 SEIU Greater New York Funds in the full amounts required, and in the event that the Union submits the matter to arbitration and prevails, the Impartial Chairman's decision shall contain a directive requiring the Employer to pay all reasonable audit and accountants' fees, the full amount of the Impartial Chairman's fees, collection expenses including court costs, if any, and interest at the then current legal rate, together with reasonable attorneys' fees for the attorney representing the Union and/or the Funds in connection with the arbitration and/or court proceedings.

Notwithstanding the foregoing, if any Employee is disentitled to any benefits provided by the Funds by reason of an Employer's delinquency in the payment of contributions, such Employer shall be liable to such Employee, in a civil action, for the full amount of the benefits which the Employee lost, together with court costs. Acceptance or collection of delinquent contributions by the Fund shall not absolve the Employer of this liability.

N.  In the event that an Employer is two (2) or more months delinquent in making contributions to the various 1199 SEIU Greater New York Funds, then the Union may take such matter to arbitration and the Impartial Chairman, in addition to granting such other relief as he may deem appropriate in the premises, shall be empowered to direct such Employer thereafter to enter into an irrevocable "check off" arrangement with the State of New York or such banking institution to enter into such a "check off" arrangement. Such "check off" arrangement must provide for the direct payment to the Funds by the State of New York or such banking institution of contributions due or becoming due from such Employer to the Funds.

The Association shall prepare documents and establish procedures to be followed in connection with the above "check off" provision and Employers shall use such documents and follow such procedures wherever practicable.

Nothing contained in the above "check off" provisions or elsewhere herein shall preclude the Union from taking any other steps which it may deem appropriate in the case of a

failure to make Fund contributions as required or make inapplicable any remedy available to the Union, contractually or otherwise.

## 30. PENSION AND HEALTH BENEFITS

A.   1.   Persons whose pensions under the Pension Plan were effective on or before December 31, 1991 and who are receiving benefits under the Pension Plan are eligible to receive health insurance coverage under the Benefit Plan and will continue to be eligible to receive such health insurance coverage for the remainder of their lives.

2.   Persons whose pension under the Pension Plan is effective between January 1, 1992 and before January 1, 2002 will not be entitled to health insurance coverage at any cost to the Benefit Plan.

3.   Persons who retire on or after January 1, 2002 from active covered employment with twenty-five (25) or more years of covered service under a pension fund recognized by the Trustees of the Benefit Fund shall be entitled to receive from the Benefit Fund the following retiree health benefits: (1) a prescription drug benefit up to fifteen hundred dollars ($1,500) per year for retirees at age sixty-two (62) or older which benefits will be coordinated with available government prescription programs; (2) an optical benefit; and (3) coverage of the hospitalization deductible applicable under Medicare. In the event that the parties cannot agree upon the adjustment, if any, in Fund contribution necessary to fund this benefit, the necessary adjustment in the contribution rate shall be set by the Impartial Chairman.

4.   Active Employees who retire on or after January 1, 2005 shall receive a pension based on an accrual rate of thirty-seven dollars ($37) per month to a maximum pension of nine hundred twenty-five dollars ($925) per month ($37 x 25 years).

5.   Effective January 1, 2011, the maximum number of years of credited service for which pension benefits may be paid shall increase from 25 years to 27 years. Active Employees who retire on or after January 1, 2011 with 27 years of credited service shall be eligible for a pension of $999 per month (27 years x the accrual rate of $37 per month). No pension credits shall accrue in 2008 and 2009.

6.   Effective August 1, 2009 newly hired Employees shall accrue pension credits at the rate of nineteen ($19) dollars per year.

B.   All Employees regularly scheduled to work full-time shall receive full-time health benefits. The Trustees of the 1199SEIU Greater New York Benefit Fund have agreed to act in a manner consistent with this provision

C.   Effective January 1, 2008, a program of savings initiatives shall be implemented that produces savings of $10 million per year over the term of this Agreement. Should a dispute

34

arise under this provision, it shall be subject to the trustee deadlock procedures of the Benefit Fund.

D.      A Cost Savings Committee ("Committee") consisting of George Gresham and Michael Balboni, Esq., or their designees, shall continue to function. The Impartial Chairman shall also serve on this Committee. The functions of the Committee shall include establishing a base line for measurement, setting benchmarks and milestones, measuring the results of and monitoring the effect of the savings initiatives referred to in this Agreement. The Committee shall also seek additional ways to improve the cost efficiency of the Benefit Fund.

E.      Effective May 1, 2008, and every twelve (12) months thereafter, a consultant retained by the Committee shall determine if the anticipated savings are being achieved. In the event of shortfall Michael Balboni, Esq. and George Gresham, or their designees, shall decide whether to direct a diversion from the Pension Fund to the Benefit Fund to make up such shortfall.

F.      Effective as soon as practicable, camp and scholarship benefits will no longer be provided by the Benefit Fund. Rather, they will be provided by the Child Care Fund (CCF) at no additional cost to the Employer. If necessary, the parties will consider diverting contributions from a Fund other than the Benefit Fund or Pension Fund to fund these benefits in the CCF.

G.      Effective September 1, 2007 legal services will cease to be provided by the Benefit Fund. As of that date, legal services will be provided by the legal plan that has been selected by the parties. The Employers shall pay to the selected legal plan the sum of $115 per full-time Employee for such services, with payments to be made directly to the legal plan in September of each year.

H.      Effective in 2010, there shall be a decrease in costs of $ 4.4 million dollars annually.

## 31. CREDIT UNION

Upon written authorization, Employers shall deduct from the wages of covered Employees voluntary contributions to the 1199 SEIU Federal Credit Union.

## 32. SEVERANCE

Employees with one or more years of substantially continuous employment who are permanently laid off shall receive severance pay at the rate of one (1) week of pay for each completed year of substantially continuous employment with an Employer up to a maximum of two (2) weeks of pay. For the purpose of this provision, a week's pay shall be defined as the regular weekly pay (exclusive of lump sum payments) of the Employee so affected which was in effect at the time of such permanent layoff.

35

## 33. CHECK-OFF AUTHORIZATION

Upon written authorization, each Employer shall deduct from the first wages paid Employees in each month all dues, assessments and initiation fees which the Union shall notify the Employer to be due to the Union from the Employee. The monies so deducted shall be held by the Employer in trust and they shall remit them to the Union promptly, together with a list of Employees paying said dues, including categories and wages paid. It is the agreement of the Association, the Union, and the Funds to implement, wherever possible, electronic transmission of Fund contributions and reports and to streamline reporting requirements. The Association, the Union, and the Funds will meet to discuss the most practicable implementation program to achieve this objective.

In the event the Employer without justification fails to promptly remit such monies, the Impartial Chairman may upon application assess interest at the legal rate against the Employer.

The Union shall have the right to audit payroll records of bargaining unit Employees to insure that Union dues are properly deducted and remitted. The Employer shall be held liable for the failure to make proper deduction of Union dues and initiation fees and to remit same to the Union promptly.

Upon written authorization, the Employer shall deduct from the wages of Employees voluntary contributions to the 1199 Political Action Fund established by the Union for political education purposes.

## 34. SEPARABILITY

In the event that any term, condition or provision of this Agreement in whole or in part is declared by any court of competent jurisdiction or any administrative agency having jurisdiction to be illegal, void and/or invalid, all of the other terms, conditions and provisions of this Agreement shall remain in full force and effect, to the same extent as if that part declared illegal, void and/or invalid had never been incorporated in this Agreement, and in such form the remainder of the Agreement shall continue to be binding upon the parties hereto.

## 35. SUCCESSORS

This Agreement shall be binding upon the parties, their successors or assigns and upon any person, party, partnership or corporation that may take over the ownership, operation and/or management of any nursing home covered by this Agreement.

## 36. NEW DIRECTION AND INNOVATION COMMITTEE

A. Committee Objectives:

36

The Union and Industry shall establish a New Direction and Innovation Committee of not less than 3 members each which shall have as its primary focus strategic planning regarding the Nursing Home Industry, the relationship between the workforce and the operators of the Industry, the relationship between the parties and government agencies as well as how to improve the job satisfaction of workers in the Nursing Home Industry.

B.  Roles and Responsibilities:

The Committee may determine its own agenda, but it is agreed the following are significant issues requiring the attention of the Committee.

(a)     Culture change;

(b)     How to cost effectively provide healthcare coverage to the workforce including the question of the appropriate healthcare benefits;

(c)     The issue of expanding the number of employers and Employees contributing the Greater New York Funds and whether a merger of the Funds with the Funds established and maintained under the League Agreement serves the interest of the workforce and the employers;

(d)     How to be ready for the transition to pay for a performance system from government entities and private payers for nursing home care; and

(e)     The Committee shall also review conforming certain provisions of the CBAs (electronic transmission of Union dues, Credit Union, Political Action, and Funds Contributions, Workers Compensation Benefit accrual, discrimination, and probationary period) with the corresponding provisions in the agreement between the Union and the League of Voluntary Hospitals and Homes. Where appropriate, the Committee may seek resources from the various Greater New York Funds, outside agencies and entities in order to facilitate its work. The Impartial Chairman shall be an Ex Officio member of the Committee.

C.     The NDIC is authorized to consider and determine the issue of whether, at the end of the term of this Agreement, the League and the Union vacation schedule shall be adopted and the accrual of benefits upon an Employee's return to work following an on the job injury or illness. Should the parties be unable to agree to a resolution of these issues at the NDIC, either side may bring this issue back to interest arbitration before the Impartial Chairman on or after January 1, 2012.

## 37.  REIMBURSEMENT CLAUSE

The parties recognize that the Employers must receive adequate reimbursement from the State of New York to provide for the economic terms and conditions described herein and are dependent upon such reimbursement for the continued implementation of the economic terms of this Agreement.

In the event that any facility does not implement any economic term or condition of this Agreement on the basis of a claim of inadequate reimbursement under this provision of the Agreement, it shall implement such term or condition to the extent it asserts it is able to do so pending a determination by the Impartial Chairman of its claim. In the event that the Impartial Chairman determines that such a claim was not made in good faith and was frivolous, such facility in addition to being required to implement such economic term or condition may be required by the Impartial Chairman to pay for all costs resulting from unnecessary hearings caused by such claim. Such costs shall include all costs and expenses of the Association's attorneys and accountants, the Union's attorneys and accountants and of the Impartial Chairman.

## 38. MOST FAVORED NATION CLAUSE

The Union, having committed itself to achieving better working conditions for all Employees in the nursing home industry, represents that it intends to provide the same conditions for workers in all nursing homes with which it has collective bargaining agreements.

In the event the Union enters into any collective bargaining agreement, memorandum of agreement or stipulation of agreement on or after June 1, 2009 with a proprietary nursing home in New York City which provides for more favorable economic terms and conditions to the Employer than those contained herein, such more favorable terms and conditions shall automatically be applicable to the Employers, except that this provision shall not apply:

to an initial collective bargaining agreement with an Employer;

to renewals of prior agreements where time to reach industry standards is provided;

to agreements with receivers;

to agreements with insolvent Employers; or

to agreements with Employers who, prior to entering into the current agreement, were non-parity facilities.

## 39. MANAGEMENT RIGHTS

The management of the nursing home and direction and control of the property and work force shall remain with the Employer. The rights herein described shall include but not be limited to: the right to hire, lay off, discharge for just cause, in case of emergency to require that duties other than those normally assigned be performed, except that "emergencies" shall not exist for longer than one (1) day; to make reasonable working rules and regulations of procedure and conduct; and to determine work shifts, provided, however, that the exercise of

these rights is to be consistent with the terms and conditions of this Agreement and is not to be used so as to discriminate against any person by reason of Union membership.

## 40. RESIGNATION FROM THE ASSOCIATION

Employers who resign from the Association shall nevertheless be bound by the terms of this Agreement for the balance of the term hereof.

## 41. DURATION

A. The parties agree that this Agreement shall be effective June 1, 2009 through September 30, 2014, except for such provisions of this Agreement with earlier effective dates. It is specifically understood and agreed that no party hereto shall engage in economic action, including strikes or lockouts, against the other for a period of forty (40) days after September 30, 2014. On or after the forty (40) day period mentioned herein, neither party shall take economic action in connection with negotiations except upon ten (10) days' notice.

B. This Agreement shall continue in effect during negotiations even though such negotiations extend beyond the expiration date for such reasonable length of time thereafter as may be required for the negotiation of a new agreement. Following the expiration date, either party may terminate the Agreement upon twenty four (24) hours' notice. Neither party shall take economic action in connection with such negotiations except upon ten (10) days' notice. Any wage increases included in such Agreement shall be retroactive to the date of expiration.

C. The Change In Conditions Reopener/Arbitration ("CCRA") shall have within its ambit the right to evaluate whether monies allocated in a particular area, for example funds contributions, are unnecessary thereby permitting their availability for upward wage adjustments. Similarly, the CCRA shall be the forum for discussions regarding the impact the State and or federal budgets have had on the nursing home industry as a whole. Any issues raised before CCRA which are unresolved may be brought by either party to interest arbitration before the Impartial Chairman. The CCRA shall meet in the last quarter of the year in 2011, 2012 and 2013.

The parties hereto have caused this Agreement to be executed by their proper officers as of the day and year first above written.

1199SEIU UNITED HEALTHCARE
WORKER'S EAST

By: *Maria Castaneda* Date: _____

MARIA CASTANEDA
SECRETARY TREASURER
3/30/2015

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION INC.

By: _____ Date: _____

Michael Balboni, Esq.
Executive Director

## SCHEDULE A

### Association Facilities

1. Atlantis
2. Fairview
3. Far Rockaway Nursing Home
4. Hillside Manor
5. Hollis Park
6. Huntington Hills
7. Manhattanville
8. New Glen Oaks
9. New Vanderbilt
10. Northern Manhattan
11. Park Gardens
12. Queens Nassau
13. River Manor
14. Sands Point
15. Sea Crest
16. Sheepshead
17. Shore View
18. Union Plaza
19. Verrazano

## SCHEDULE B*

### MINIMUM RATES OF PAY

Greater New York Minimum Rates of Pay

Schedule B

| Classification | Hours | Effective Date 12/1/2009 | | Effective Date 12/1/2010 | | Effective Date 12/1/2011 | | Effective Date 12/1/2012 | | Effective Date 12/1/2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Hourly Rate | Weekly Rate | Hourly Rate | Weekly Rate | Hourly Rate | Weekly Rate | Hourly Rate | Weekly Rate | Hourly Rate | Weekly Rate |
| Classification | | | | | | | | | | | |
| Licensed Practical Nurse Unit | | | | | | | | | | | |
| LPN | 35 | $21.47 | $751.45 | $21.47 | $751.45 | $21.95 | $768.38 | $22.50 | $787.57 | $23.06 | $807.26 |
| Social Worker, B.S.W.** | 35 | $22.53 | $788.55 | $22.53 | $788.55 | $23.04 | $806.29 | $23.61 | $826.45 | $24.20 | $847.11 |
| Recreation Worker Bachelors Degree* | 35 | $23.06 | $807.10 | $23.06 | $807.10 | $23.58 | $825.28 | $24.17 | $845.89 | $24.77 | $867.04 |
| Dietitian Technician (Practical)** | 35 | $19.84 | $694.40 | $19.84 | $694.40 | $20.29 | $710.02 | $20.79 | $727.77 | $21.31 | $745.97 |
| Dietitian Graduate* | 35 | $20.81 | $728.35 | $20.81 | $728.35 | $21.28 | $744.74 | $21.81 | $763.36 | $22.38 | $782.44 |

* Nothing contained in this Schedule B is intended to expand existing bargaining units. Such expansion may occur upon the Union's demonstration through a card count by the Impartial Chairman that it represents a majority of Employees hereofore unrepresented by it employed by any Employer member of the Association. Upon such a showing, such Employees shall thereafter be covered by all the terms and conditions of the collective bargaining agreement.

** The minimum rates of pay for these job classifications are subject to adjustment as a result of an interest arbitration pending before the Impartial Chairman.

*** The minimum rates applicable to this job classification shall be those set forth in this Agreement.

**** The fringe benefits applicable to full-timers in the appropriate classifications. The part-time minimum hourly rate shall be the weekly rate.

***** There were no actual raises to the minimums in 2008, only a lump sum payment.

Hourly rates are provided for reference purposes only. The parties agree the weekly minimums are the minimum rates applicable to full-timers in the appropriate classifications. The part-time minimum hourly rate shall be the weekly rate divided by the full-time work week.

## SCHEDULE C
### (SLOTTING SCHEDULE)

V=Vacation Day   H=Holiday   S=Sick Day   P=Personal Day   L=Other Paid Leave   O=Other

SCHEDULE PERIOD:

MONTH: _____  DATE: _____  YEAR: _____

SHIFT _____

| TITLE | STAFF MEMBER | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N.A. | Smith, A. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Jones, B. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Brown, C. | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x |
| N.A. | Black, D. | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x |
| N.A. | White, E. |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |   |   |   | x | x | x | x |
| N.A. | O'Brian, F. |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |
| N.A. | Blue, G. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Craig, H. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Joyce, L. |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |
| N.B. | Lam, J. |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |
| N.A. | Rodriquez, K. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Garcia, L. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Calder, M. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Nixon, N. |   |   |   | x |   |   |   |   |   |   | x |   |   |   |   |   |   | x |   |   |   |   |   |   | x |   |   |   |
| N.A. | Pope, O | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Casal, P. | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   | x | x | x | x | x |   |   |
| N.A. | Forest, A. |   |   |   |   |   | x | x |   |   |   |   |   | x | x |   |   |   |   |   | x | x |   |   |   |   |   | x | x |

Each schedule shall clearly and conspicuously show the date and shift on which each slotted employee was scheduled and the name of each non-slotted/replacement employee who worked during the period covered by the schedule, the dates and shifts on which each such non-slotted/replacement employee worked, the names of the slotted employees each such non-slotted employee replaced and the type of leave taken by each replaced slotted employee.

43

## SCHEDULE C
### (SLOTTING SCHEDULE)

V=Vacation Day    H=Holiday    S=Sick Day    P=Personal Day    L=Other Paid Leave    O=Other

SCHEDULE PERIOD:

MONTH:                    DATE:            YEAR:

| SHIFT | TITLE | STAFF MEMBER | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
|-------|-------|--------------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|       |       |              |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
|       |       |              |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
|       |       |              |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
|       |       |              |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
|       |       |              |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |

Each schedule shall clearly and conspicuously show the date and shift on which each slotted employee was scheduled and the name of each non-slotted/replacement employee who worked during the period covered by the schedule, the dates and shifts on which each such non-slotted/replacement employee worked, the names of the slotted employees each such non-slotted employee replaced and the type of leave taken by each replaced slotted employee.

44

ATTACHMENT "A"

Mr. Michael Balboni, Esq., Executive Director

Greater New York Health Care
Facilities Association
21 Penn Plaza
360 West 31st Street, 5th Floor
New York, New York  10001

Re:   Quality of Work Issues

Contract and Benefits Administration Program

Dear Mr. Balboni:

This letter is delivered to you simultaneously with the execution of the 2007-2011 Collective Bargaining Agreement, and sets forth certain agreements reached by the parties with respect to said Agreement.

Quality of Work Issues:   The Association and the Union have agreed to continue discussions concerning certain issues raised during negotiations.  These issues are: (1) mandatory overtime, (2) patient lift transfers and, (3) quality of care issues as set forth in the Quality Care Committee attachment to this letter.  The parties may refer these issues to interest based bargaining with the assistance of the Worker Participation Fund.

Contract Administrators:   The Association and the Union shall continue the Contract Administrators program for the purpose of providing Labor Relations and benefits administration. The release of Contract Administrators shall not unreasonably interfere with the operations of the Employer.  The cost of the Contract Administrators Program shall be paid through the Worker Participation Fund.

Very truly yours,

*Maria Castaneda*
MARIA CASTANEDA          3/30/15
SECRETARY TREASURER

Accepted:

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION

Michael Balboni, Esq.
Executive Director

45

ATTACHMENT "B"

QUALITY CARE COMMITTEE

Committee Objectives:

The Association and the Union have agreed to discuss the establishment of a Quality Care Committee to study and review nursing care practices, including job assignments and duties of bargaining unit members, in Nursing Homes leading to recommendations to the Association and 1199 Nursing Home Division leadership in nursing care practices, including staffing, with the goal of providing appropriate care for each resident in accordance with New York State standards.  This committee shall also consider professional and technical practice issues.

Possible Project Structure, Roles & Responsibilities

*Quality Care Committee* (QCC) consisting of one nursing department bargaining unit member and one management representative from each Association nursing home chosen by each of the respective parties will:

- Screen and select expert(s) to conduct research

- Assist in gathering of patient care data, including current staffing patterns, and job descriptions at each of the Association homes

- Review and evaluate data collected

- Develop recommendations to the Association and 1199 leadership

- Use interest based problem solving as basis for discussions

- Provide regular updates to the leadership of Association and 1199 of progress

- Maintain records of their meetings

- Meet one day per month or as determined by the Committee

- In order to expedite the work of the QCC, subcommittees may be established to study different facets of this issue

*Quality Care Committee Oversight Committee* consisting of two (2) union and two (2) management leadership representatives will:

46

- Oversee this effort including finalizing the process

- Identify and clear up any roadblocks

- Represent committee between meetings as needed

- Advise and direct the consultants (from the Labor Management Project and any additional external experts)

- Monitor the budget

- Review the recommendations of the QCC and determine how to proceed to effectuate those recommendations that are agreed upon

- Will meet monthly or as determined by the Committee

*Labor Management Project* staff will:

- Facilitate meetings of the Quality Care Committee, Oversight Committee

- Provide orientation and training, as required, for the committees on the interest based problem solving process

- Report to the Oversight Committee

*Research Consultant(s)/Expert(s)* will (list to be completed by the QCC):

- Identify standards in nursing home nursing care practices

- Assist the committee in analyzing the data gathered

- Assist the Committee in preparing a report on data and analysis to present to Association and 1199 leadership

*Timeframe*: the goal of the QCC will be to deliver recommendations within one year from the initial meeting of the committee.

*Boundaries*: The parties recognize that

- Some of the recommendations may be outside the control of the Nursing Home Administrators and will suggest legislative intervention.

47

- There are a combination of factors that influence nursing practices and staffing such as resident acuity, technology, different types of care, unit size and geography, qualifications of staff, standards of practice, staff mix, productivity, nature of resident care provided and financial resources.

Nothing contained herein shall be subject to the Grievance and Arbitration provisions of the Contract.

## ATTACHMENT "C"

June 1, 2009

Mr. George Gresham
1199SEIU Healthcare Workers East
310 West 43rd Street
New York, NY 10036

Dear Mr. George:

This letter is delivered simultaneously with the execution of the 2009-2014 CBA Agreement between the Association and the Union covering the period June 1, 2009-September 30, 2014, and has the same force and effect as if set forth therein.

With respect to the Reimbursement Clause (Article 37) of the CBA, it is understood as follows:

1. There shall be no Association-wide claim of inadequate reimbursement.
2. Prior to any Employer exercising any rights it may have under Article 37 in the case of inadequate reimbursement, it must first submit its claim of inadequate reimbursement to the Labor Management Reimbursement Review Committee comprised of Union members George Gresham, Dan Ratner, Irwin Bluestein and Employer members Michael Balboni, Esq., Mark Sussman, Morris Tuchman, Eric Simon and Impartial Chairman Martin Scheinman. A quorum of two (2) Union members and two (2) Employer members of the Committee and the Impartial Chairman shall be required for the conduct of the Committee's business. No Employer may implement any lesser term or condition of employment, nor may any Employer's claim be submitted for adjudication by the Impartial Chairman, without having first been submitted to the committee.
3. The Committee shall have full access to cost reports, rate sheets, and other documents, books and records as it may require to evaluate the Employer's claim of inadequate reimbursement.
4. The fourth "Whereas" provision in the CBA is deleted as it is no longer relevant.

Very truly yours,

GREATER NEW YORK RESIDENTIAL
HEALTHCARE FACILITIES ASSOCIATION, INC.

By _____

　　Michael Balboni, Esq.
　　Executive Director

AGREED:
1199SEIU UNITED HEALTHCARE WORKERS EAST

By: _Maria Castaneda_
　　MARIA CASTANEDA
　　SECRETARY TREASURER
　　3/30/15

49

## ATTACHMENT D PENSION PREFERRED SCHEDULE

<u>Preferred Schedule</u>

The changes described in the Preferred Schedule will be become effective upon the effective date of a collective bargaining agreement that adopts a contribution schedule containing terms consistent with this Preferred Schedule.  This date is referred to below as the "Preferred Schedule Effective Date".

Employers to whom the Preferred Schedule does not apply shall remain subject to the surcharges imposed under the Pension Protection Act until such time as they adopt a contribution schedule that contains terms consistent with this Preferred Schedule or the Default Schedule.

<u>No Change in Rate of Future Benefit Accruals Except for New Hires:</u> The Preferred Schedule does not require a change in the rate of future benefit accruals under the terms of the Plan as of March 30, 2009 (the day before the date of certification for the Plan's initial critical year), *except that,* new hires on or after August 1, 2009 shall accrue a monthly benefit (payable as a single life annuity at Normal Retirement Age, as such term is defined in the Pension plan) equal to $19 per year of credited service, effective January 1, 2010, with a maximum of 27 years of credited service, effective January 1, 2011.

<u>No Reduction and/or Elimination of Adjustable Benefits:</u> The Preferred Schedule does not require a reduction or elimination of adjustable benefits under the terms of the Plan as of March 30, 2009 (the day before the date of certification for the Plan's initial critical year).

Contribution Requirement/Increase:  The Preferred Schedule requires increases in the applicable contribution rate as follows:

For "parity employers," effective for the period beginning on January 1, 2011 and ending on

August 31, 2014, the contribution rate shall be nine (9.00%) percent of gross payroll (as defined in the collective bargaining agreements).

For "non-parity employers," effective January 1, 2011, the contribution rate shall be three and fourty-one hundredths (3.41%) percent above the contribution rate as of December 31, 2010. This rate will increase by one quarter (0.25%) percent effective each January 1 of 2012, 2013, and 2014. Notwithstanding the forgoing, the contribution rate for "non-parity employers" during the period beginning on January 1, 2011 and ending on August 31, 2014 shall not exceed nine (9.00%) percent of gross payroll (as defined in the collective bargaining agreements).

For both "parity employers" and "non-parity employers," effective September 1, 2014 and through the remainder of the Rehabilitation Period, the contribution rate shall be nine and one tenth (9.10%) percent of gross payroll (as defined in the collective bargaining agreements).

## ATTACHMENT E PAYMENT OF BARGAINING COMMITTEE MEMBERS

The Bargaining Committee members shall be paid by their Employers for this round of negotiations, no more than two (2) Employees per facility.

ATTACHMENT F GNY BENEFIT FUND

GNY Benefit Fund

A. SPOUSAL PREMIUMS

Effective March 1, 2011, there shall be a thirty ($30.00) dollar per week premium payment from any Employee electing to have his or her spouse or domestic partner covered by the GNY Benefit Fund. This amount shall be deducted on a weekly basis from the Employee's paycheck. The Employee shall make the election whether to have his or her spouse or domestic partner covered by the GNY Benefit Fund in writing. Once selected, the Employee may change either to have a spouse or domestic partner covered or dropped from coverage every six (6) months. For new Employees hired after January 1, 2011, other than those referred by the Job Security Fund, or those previously covered by the NBF or GNY Benefit Fund, if the Employee elects to have his or her spouse or domestic partner covered by the GNY Benefit Fund, he or she shall pay a total of sixty ($60.00) dollars per week during the first five (5) years of employment. Beginning in the sixth (6th) year of employment, the Employee shall pay the premium contribution like other Employees electing to have his or her spouse or domestic partner covered. This sixty ($60.00) dollars fee shall be deducted from the Employee's paycheck. The Employers shall remit all monies deducted from Employees' paychecks to the GNY Benefit Fund no later than the Friday following the end of the calendar month. This shall be a separate check distinct from the ordinary remittance to the various Funds. The check shall be accompanied by a remittance report indicating which Employees the Employer has deducted the premium from, and in what amount.

B. EMPLOYEE CO-PAYMENTS

Effective March 1, 2011, all participants in the GNY Benefit Fund shall pay the following co-payments for specified services as follows: A seventy-five dollar ($75.00) co-payment for any emergency room visit.

1) A ten dollar ($10) primary care physician ("PCP") co-payment (five dollars ($5) effective March 1, 2013) except on preventive services

2) A fifteen ($15) specialist office visit (ten dollars ($10) effective March 1, 2013) except on preventive services.

3) A fifteen ($15) co-payment for CT, MRI, Pet Scans and MRAs.

4) A prescription/drug co-payment of four dollars ($4) for generic and twelve dollars ($12) brand when a prescription is obtained at a retail store.

5) A ten dollar ($10) co-payment generic and a twenty dollar ($20) co-payment for brand for any mail order prescription.

6) These co-payments do not apply to preventive care services. All co-payments apply to both participating and non-participating providers. Participating and beneficiaries seeing a non-participating provider shall pay the difference between that provider's fees and the GNY

53

Benefit Fund's schedule of allowance as well as the corresponding co-payment even if the co-payment is not able to be collected during the office visit.

C.   FEASIBILITY STUDY

The GNY Benefit Fund shall do a feasibility study to analyze whether covered services can be provided in a more cost-effective setting.  Specifically, the GNY Benefit Fund Administration is directed to study whether inpatient acute physical rehabilitation, hemodialysis, TBI (traumatic brain injury), respiratory therapy, and non-acute rehabilitation therapy can be provided in a more cost-efficient nursing home setting while maintaining the same or better quality of care. If the feasibility establishes such services can be provided in a more cost-efficient nursing home setting, the GNY Benefit Fund Administration shall establish and implement a demonstration program under which such services are to be provided in up to three (3) providers in each county in New York City and the surrounding suburban counties where plan participants and beneficiaries are located.  The GNY Benefit Fund Administration shall determine the criteria under which homes will be selected, though the selection shall be based on the provider having demonstrated the ability to provide these services at a high level of quality and at a lesser cost.

D.   COST CONTAINMENT

As a cost containment measure, the life insurance benefit shall be removed from the GNY Benefit Fund, provided an alternate program or vehicle is identified, such as, the GNY Pension Fund, or other Fund, incorporating certain alternative proposals involving the purchase of life insurance.  The Trustees of the various Funds shall determine whether such a program(s) or vehicle(s) would have the dual effect of retaining the benefits for each covered individual while lowering the Employers' contribution rate and are consistent with Government Accounting Board Standards ("GASB") and Financial Accounting Standards ("FASB").

E.   WELLNESS/DISEASE MANAGEMENT

The administration of the GNY Benefit Fund has an ongoing inquiry to determine if any explanation, and possible remediation can lessen the health care trend line.  The GNY Benefit Fund has developed and implemented wellness/disease management programs which, over time, should improve the lives of the Funds' participants and bend the curve of health costs.  The collective bargaining parties shall appoint a labor-management subcommittee to explore ways to broaden this endeavor into the workplaces and to investigate expanding the novel approaches in place with regard to better manage care, including expanding disease management and health initiatives.

F.   HEALTHCARE TRENDS UPDATES

The GNY Benefit Fund's Actuary shall provide updates every two (2) months of the then current health care trend for the GNY Benefit Fund.  The Impartial Chairman shall schedule additional hearings and issue supplemental Awards if the premises underpinning his May 26, 2010 Trustee Deadlock/Interest Arbitration turn out to be inaccurate.

## ATTACHMENT G OTHER PROPOSED CHANGES FROM EMPLOYERS

Other Proposed Changes from Employers

The parties shall discuss for a period of forty-five days, whether contributions to the Benefit Fund on behalf of employees hired on or after June 1, 2009 should be delayed until such employees have completed six (6) calendar months of employment. The Employers' other proposals for changes regarding new hires shall be discussed between the parties for a period of forty five (45) calendar days. This shall include specific provisions proposed by certain Associations.

Should the parties not be able to agree on the above issues, they may submit their positions to the Impartial Chairman in writing for a supplemental award.

**SIDE LETTER #1**

June 1, 2009

Mr. George Gresham
1199SEIU United Healthcare Workers East
310 West 43rd Street
New York, New York 10036

Dear Mr. George Gresham:

With respect to paragraphs 6.b, c, and f of the MOA executed this day, it is understood as follows:

If as a result of new employers becoming contributing employers to the Benefit Fund it appears, based on the advice of the Benefit Fund and Pension Fund actuaries, that the March and April 2014 four (4%) percent contributions and the March 2012 lump sum contributions are not necessary to fund the Benefit Fund and/or Pension Fund those contributions will not be required to be made.

Very truly yours,

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION, INC.

By: _____
      Michael Balboni, Esq.
      Executive Director

AGREED:

1199SEIU UNITED HEALTHCARE
WORKERS EAST

By: _____
      MARIA CASTANEDA
      SECRETARY - TREASURER
      3/30/15

56

**SIDE LETTER #2**

June 1, 2009

Mr. George Gresham
1199SEIU United Healthcare Workers East
310 West 43rd Street
New York, New York 10036

Dear Mr. Gresham:

With respect to Article 29 § E paragraph 2 of the CBA executed this day, it is understood as follows:

It is the intent of the parties that Employees of employers contributing, or scheduled to contribute, not less than the minimum contribution rates required in Article 29 § E paragraph 2 shall be entitled to the Pension Fund accrual rate for credited service (currently $37 per year per month).

Very truly yours,

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION, INC.

By: _____

Michael Balboni, Esq.
Executive Director

AGREED:

1199SEIU UNITED HEALTHCARE
WORKERS EAST

By: _____
MARIA CASTANEDA
SECRETARY TREASURER
3/30/15

57

## SIDE LETTER #3

June 1, 2009

Mr. George Gresham
1199SEIU United Healthcare Workers East
310 West 43rd Street
New York, New York 10036

Dear Mr. Gresham:

With respect to Article 30 of the CBA executed this day, it is understood as follows:

The parties shall discuss the possibility of providing the Benefit Fund life insurance benefit outside the Benefit Fund and the cost implications and potential funding sources for providing this benefit (other than the Benefit Fund).

Very truly yours,

GREATER NEW YORK HEALTH
CARE FACILITIES ASSOCIATION, INC.

By: _____

Michael Balboni, Esq.
Executive Director

AGREED:

1199SEIU UNITED HEALTHCARE
WORKERS EAST

By: _____
MARIA CASTANEDA
SECRETARY TREASURER
3/30/15

58

GREATER NEW YORK 2014-2017
MEMORANDUM OF AGREEMENT

WHEREAS, 1199SEIU United Healthcare Workers East ("1199") and the Greater New York Health Care Facilities Association, the Empire State Labor Group, the Southern New York Associates, the United Health Care Association, the Long Island Healthcare Labor Association, and the independent facilities on attachment A ("Employers") are parties to Collective Bargaining Agreements effective from July 1, 2009 through September 30, 2014, the ("CBAs");

WHEREAS, the parties acknowledge that the budget of the State of New York contains additional funding to long term care facilities to improve employee retention rates, and that based on such additional funding the parties agree the economic terms of this Agreement are predictable and sustainable for its term; and

WHEREAS, the parties are desirous of maintaining amicable collective bargaining relationships and maintaining the employees' terms and conditions of employment during these challenging economic times;

WHEREAS, the parties desire to extend the CBAs through September 30, 2017, except as modified below; and

NOW THEREFORE, the parties enter into this 2014-2017 MOA, as follows:

1.  Continuation of Terms - All of the terms and conditions in the CBAs, including all side letters, exhibits, stipulations and attachments thereto, shall remain in full force and effect and, are hereby extended through midnight on September 30, 2017, except as expressly modified below.

2.  Wages

    a.  Effective as of and retroactive to December 1, 2014, each Employee shall receive a 3% increase in his or her wages, or be paid the minimum rate for his or her classification, whichever is greater. The minimum rates and steps (if applicable) shall also be increased by 3%.

        This wage increase shall be implemented effective the first full payroll period immediately following July 1, 2015. The Employers shall make retroactive payments, in separate checks paid at the most favorable tax rate, due under this Agreement as follows: 50% no later than September 1, 2015 and 50% no later than October 1, 2015. The retroactive payments shall be payable to any Employee employed on September 30, 2014, or thereafter, and still employed on the date of ratification by the parties, and to any Employee who retired from active employment between September 30, 2014 and the date of implementation of the above referenced increase. Any Employee on an unpaid leave as of the date of payment of the retroactive wages shall be entitled to such payment upon the completion of 90 calendar days of active employment following the return from leave.

    b.    Effective as of December 1, 2015, each Employee shall each receive a 3% increase in his or her wages, or be paid the minimum rate for his or her classification, whichever is greater. The minimum rates and steps (if applicable) shall also be increased by 3%.

    c.    Effective as of December 1, 2016, each Employee shall receive a 3.50% increase in his or her wages, or be paid the minimum rate for his or her classification, whichever is greater. The minimum rates and steps (if applicable) shall also be increased by 3.50%.

    d.    The Nicolau Award hourly hiring rates shall apply hereunder for employees hired after the ratification of this Agreement. This provision only applies to facilities whose minimum rates exceed those established pursuant to the Nicolau Award.

3.    Staffing:

    a.    The October 29, 2014 Scheinman Award regarding "bench" employees shall be fully implemented. Other- staffing related issues before Mr. Scheinman shall await further direction from Mr. Scheinman pursuant to his October 29, 2014 Award.

    b.    Filling Vacant Positions: Prior to hiring from the outside, Employers shall fill vacant regular/slotted positions, defined as positions for which the Employer is actively recruiting, only in the following order:

        i.    From recall[1]

        ii.    Offering regular part-time Employees, by seniority, full-time hours;

        iii.    Offering replacement/non-slotted employees, or if applicable, so called "no-frills" employees, by seniority, regular positions;

        iv.    From the Job Security Fund;

    c.    LPNs: The parties shall, immediately upon ratification, submit to the Impartial Chairman the issue of rehabilitation of the bargaining unit through, *inter alia*, the hiring of LPNs to further effectuate his October 29, 2014 Award. The parties hereby agree that, immediately upon ratification:

        i.    Modify Article 18, Section H: An Employer must make an offer of promotion or Employment to incumbent employees of the

---

[1] Article 7 (Seniority), Section d(3) of the CBAs: Shall be modified by adding the following: non-probationary employees laid off shall be recalled to any vacant position within their former classification prior to any other employee being hired or promoted into such position. Non-probationary employees shall enjoy recall rights for the lesser of one (1) year from the date of layoff or the length of continuous service at the time of layoff.

individual facility who secure LPN licenses to fill vacant LPN positions.

    a.    In connection with such hiring the parties shall discuss with the JSF 1) providing a preceptor funded by the JSF to assist the transition to an LPN position and 2) the creation of an apprenticeship program funded by the JSF to, upon promotion of a CNA to an LPN and/or the hiring of an LPN referred by the JSF, reimburse the Employer up to 15% of the minimum base rate for the LPN's first year at the facility.

    ii.    Any Relief or Remedies ordered in the Impartial Chair's decision rendered pursuant to Article 3(a) of this Agreement shall survive the expiration of this MOA, if so ordered. Moreover, the Employers waive their right to seek in the successor MOA modification of relief related to the hiring of additional Employees granted pursuant to that Award.

d.    Electronic Reporting and Enforcement of Staffing Requirements: Within thirty days of ratification of this agreement by the parties, the parties shall adopt an electronic excel format for reporting schedules, staffing patterns, and fund remittances. The parties agree that these reports shall include staffing information regarding usage of regular works, agency workers, replacement workers, and information set forth in Article 11, Section C and the footnote to Schedule C of the CBA. If the parties are unable to agree to such a format, the issue shall be submitted to the Impartial Chairman.

    i.    Within 20 days after the end of each month, the employers shall submit monthly statements, in electronic format, to the GNYBF and 1199 which shall contain the information set forth in section (d) above.

    ii.    The parties shall designate two full-time staff persons, who shall be paid out of the WPF, to review monthly statements and notify the Union and the Employers of any apparent staffing violations.

    iii.    Upon notification of an apparent violation, the Union and each identified Employer shall meet as soon as practicable thereafter to resolve any dispute. If they cannot reach agreement, the matter shall be referred to the Impartial Chair who shall hold an arbitration within 20 days (conference call and teleconference hearings may be set by the Chair), and who shall issue an Award, without opinion, within 10 days after the hearing. At the Impartial Chair's discretion, an opinion consistent with the Award may follow.

iv.    All disputes that are heard by the Impartial Chair pursuant to this provision, and where a violation is found, the Impartial Chair shall have the authority to award the following:

     a.    Actual damages to the Union and the Funds (as designated by the Impartial Chairman) and all costs resulting from the arbitration hearings, including the Impartial Chairman's fee, and the costs and expenses of the attorneys and accountants for the Association or Group, for the Union and for the Benefit Funds.

     b.    In addition to the damages provided for above, recidivist Employers shall be denied the use of non-slotted and agency employees, as set forth in Article 11(c)(1) of the CBA.

4.    Pension Fund contributions:  The Employers shall contribute:

     11.7% of gross payroll effective July 1, 2015

5.    Pension Fund Benefits:  The parties shall recommend to the Trustees of the GNY Pension Fund that they immediately make such plan design changes to increase Pension accruals of RNs and LPNs hired after July 1, 2009, provided it can be done at a cost of 11.7%.  Effective July 1, 2017, the parties shall implement a program to increase the Pension Accruals of employees hired on or after July 1, 2009, provided it can be done at a cost of 11.7%.  If the cost of the programs exceeds 11.7%, the parties shall meet to discuss the matter.

6.    Benefit Fund:  The Employers shall contribute:

| | 4/1/15 | 4/1/16 | 4/1/17 |
|---|---|---|---|
| Master Rates | 28.05% | 28.05% | 28.05% |

The combined contribution rate to the BF and the PF for the duration of this Agreement shall not exceed 39.75% for Master facilities.

     a.    The parties will recommend to the Trustees of the Fund that, to the extent such changes are consistent with their fiduciary obligations and the above outlined contribution rates, effective as of July 1, 2015, they make the following changes in plan design:

        i.    the prescription drug co-pays shall be eliminated; and

        ii.    the spousal premium be reduced to $25.00 per week for all employees.

7.   Protected Status:   Effective January 1, 2015 employees hired prior to January 2005 shall have protected status.

8.   Pro-Tech Classifications:   In the event 1199 and the League agree on modifications to uniform professional and technical classifications, where applicable, the parties shall meet to discuss the adoption of such changes. Disagreements, if any, resulting from such changes all not be subject to arbitration before the Impartial Chairman.

9.   Waiver of Sick Leave:   The Union accepts all comparable benefits under the CBA in lieu of any other benefits that may be available under the New York City Earned Sick Time Act ("Act") and expressly waives the provisions of the Act, except that the waiver does not apply to: (1) the Act's prohibition on employer retaliation against Employees for the use of sick leave, including discipline under appoint or occurrence system, but not including discipline for fraud, misuse or abuse of sick leave, or use of sick leave for purposes other than those described in the Act; or (2) the Act's provision of sick leave to care for a family member as defined by the Act.

10.   Employees discharged for cause shall not receive their accrued but unused sick leave.

11.   Reimbursement:   Article 38, paragraph 1, shall be modified as follows: The parties recognize that the Employers must receive adequate revenue from all payers to pay for the economic terms and conditions of this Agreement. In determining the affordability of the economic terms of this Agreement, the bargaining unit labor portion of reimbursement from all sources including Medicaid, Medicare, Managed Care companies, and private payers shall be considered.

12.   LPN Vacations:   Effective upon ratification, LPNs shall receive paid vacation as follows:

| Years of Completed Service | |
|---|---|
| 6 months to one year | 2.0 weeks |
| 1 year | 4. 0 weeks |
| 25 years or more | 5.0 weeks |

LPNs who have completed one year of service but less than 25 years of service shall as of their anniversary date following ratification of this Agreement be entitled to 4.0 weeks of vacation.

13.   Contract Language – The parties shall incorporate the provisions of this settlement into one collective bargaining agreement for each Employer Association and Group including all three classifications of employees: paraprofessional, LPN, and RN. Nothing herein is intended to change or merge

existing single employer bargaining units or to merge existing separate Paraprofessional, LPN, and RN units.

14. Any dispute regarding updating existing language incorporating the terms of the settlement shall be submitted to the Impartial Chairman within 30 days of settlement for resolution by him within 30 days after submission.

15. Martin F. Scheinman, Esq. shall continue as Impartial Chairman under the CBAs.

16. Within 15 days of the ratification of this Agreement, up to two (2) bargaining committee members shall be paid for all work-time lost a result of their attendance at bargaining session for this MOA.

17. This MOA is subject to Union and membership ratification and ratification by the respective Employer Associations and Groups and independent Employers negotiating with them.[2]

Dated: June _____, 2015

Accepted and Agreed to:                                                        Accepted and agreed to:

_____

---

[2] Exhibit _____ contains a list of the Employers participating in the negotiations.

1-991-00003 . 10565775_6.doc

6

**1199SEIU**
United Healthcare Workers East

PRESIDENT
George Gresham

SECRETARY TREASURER
Maria Castaneda

EXECUTIVE VICE-PRESIDENTS
Norma Amsterdam
Yvonne Armstrong
Lisa Brown
Angela Doyle
George Kennedy
Steve Kramer
Joyce Neil
John Reid
Bruce Richard
Mike Rifkin
Monica Russo
Rona Shapiro
Neva Shillingford
Milly Silva
Veronica Turner
Laurie Vallone
Estela Vazquez

VICE-PRESIDENTS AT LARGE
Mark Bergen
Gerard Cadet
Rickey Elliott
Dale Ewart
Tim Foley
Pearl Granat
Vanessa Johnson
Pat Lippold
Barbara Rosenthal
Helen Schaub
Allan Sherman
Minerva Solla
Katherine Taylor
Celia Wcislo

VICE-PRESIDENTS
Jacqueline Alleyne
Shaywaal Amin
Ronnie Babb
Carolyn Brooks
Sally Cabral
Donald Crosswell
Robert Davis Gibson
Jude Derisme
Armeta Dixon
Enid Eckstein
Camille Edwards
Jerry Fishbein
Vladimir Fortunny
Jennifer Foster-Epps
Roy Garcia
Frances Gentle
Ericka Gomez
Derek Grate, Sr.
Rebecca Gutman
Ruth Heller
Kwai Kin (David) Ho
Todd Hobler
Antonio Howell
Herbert Jean-Baptiste
Brian Joseph
Keith Joseph
Maria Kercado
Tyrek Lee
Rosa Lomuscio
Winslow Luna
Coraminita Mahr
Dalton Mayfield
Rhina Molina
Robert Moore
Aida Morales
Isaac Nortey
Vasper Phillips
Bruce Popper
Lawrence M. Porter
Rhadames Rivera
Victor Rivera
Rene R. Ruiz
Clauvice St. Hilaire
James Scordato
John Seales
Berta Silva
Patricia Smith
Greg Speller
Clare Thompson
Oscar Torres Fernandez
Kathy Tucker
Antonetta Turner
Ana Vazquez
Julio Vives
Lisa Wallace
Margaret West-Allen
Dana Williams
Cynthia Wolff
Gladys Wrenick

GENERAL COUNSEL
Daniel J. Ratner

CHIEF FINANCIAL OFFICER &
DIRECTOR OF ADMINISTRATION
Michael Cooperman

*Acting

Re: 1199SEIU & Greater New York Health Care Facilities Association
2014-17 MOA Funding Assumptions

Dear:

This letter is delivered simultaneously with the execution of the 2014-17 Extension Memorandum of Agreement ("2014 MOA") between 1199SEIU and [INSERT NAME OF HOME ("Home")] which has bargained with the facilities listed on Schedule A of the 2014 MOA, collectively referred to as the "Greater New York Homes" or "Homes".

Home is a contributor to the 1199SEIU Greater New York Benefit Fund ("BF") and is responsible for its contribution rates as provided in the 2014 MOA and this side letter.

The Home's contributions to the BF, as well as its contributions to industry pension, education, job security and child care funds for benefits, including enhanced training through the education fund, enhance Employee retention rates. Recognizing that higher Employee retention positively impacts patient care, the State has provided in its budget additional funding for fiscal years FY 2015-16 and FY 2016-17 based on retention rates. It is anticipated that the Homes will receive a significant portion of this additional funding because of their favorable retention rates.

As a result, the Homes shall pool their retention funding with the other employers participating in the BF. All retention funding received by the Home, each year shall be paid to the BF, and the Home and each participating facility in the Greater New York Homes negotiations shall be entitled to credits against future contributions to the BF which credits shall be aggregated and shared between all homes in the Greater New York Homes negotiations. Any facility that remits its retention money in full to the BF shall be entitled to a reduction of its contribution rates equal to three (3%) percentage points from the rates set forth in the MOA. Such credits to the Home and the total credits available to all facilities bargaining as part of the Greater New York Homes, shall not exceed the total aggregate retention funding received by the Greater New York Homes and remitted to the BF. The requirement that the Home turn over all retention funding to the BF shall be deemed a contribution requirement under the MOA, enforceable through the contribution collection procedures.

# 1199SEIU
## United Healthcare Workers East

**PRESIDENT**
George Gresham

**SECRETARY TREASURER**
Maria Castaneda

**EXECUTIVE VICE-PRESIDENTS**
Norma Amsterdam
Yvonne Armstrong
Lisa Brown
Angela Doyle
George Kennedy
Steve Kramer
Joyce Neil
John Reid
Bruce Richard
Mike Rifkin
Monica Russo
Rona Shapiro
Neva Shillingford
Milly Silva
Veronica Turner
Laurie Vallone
Estela Vazquez

**VICE-PRESIDENTS AT LARGE**
Mark Bergen
Gerard Cadet
Rickey Elliott
Dale Ewart
Tim Foley
Pearl Granat
Vanessa Johnston
Pat Lippold
Barbara Rosenthal
Helen Schaub
Allan Sherman
Minerva Solla
Katherine Taylor
Celia Wcislo

**VICE-PRESIDENTS**
Jacqueline Alleyne
Shaywaal Amin
Ronnie Babb
Carolyn Brooks
Sally Cabral
Donald Cropwell
Robert Davis Gibson
Jude Derisme
Armeta Dixon
Enid Eckstein
Camille Edwards
Jerry Fishbein
Vladimir Fortunny
Jennifer Foster-Epps
Roy Garcia
Frances Gentle
Ericka Gomez
Derek Grate, Sr.
Rebecca Gutman
Ruth Heller
Kwai Kin (David) Ho
Todd Hobler
Antonio Howell
Herbert Jean-Baptiste
Brian Joseph
Keith Joseph
Maria Kercado
Tyrek Lee
Rosa Lomuscio
Winslow Luna
Coraminita Mahr
Dalton Mayfield
Rhina Molina
Robert Moore*
Alda Morales
Isaac Nortey
Vasper Phillips
Bruce Popper
Lawrence M. Porter
Rhodgames Rivera
Victor Rivera
Rene R. Ruiz
Claurice St. Hilaire
James Scordato
John Seales
Berta Silva
Patricia Smith
Greg Speller
Clare Thompson
Oscar Torres Fernandez
Kathy Tucker
Antoinette Turner
Ana Vazquez
Julio Vives
Ilsa Wallace
Margaret West-Allen
Dairie Williams
Cynthia Wolff
Gladys Wrenick

**GENERAL COUNSEL**
Daniel J. Ratner

**CHIEF FINANCIAL OFFICER &**
**DIRECTOR OF ADMINISTRATION**
Michael Cooperman

*Acting

The parties also anticipate that additional recruitment and retention money from the State of New York will be available to continue to provide high quality pensions, health, education, job security, child care and training benefits for fiscal year 2017-2018. Such benefits will enable the Home to continue to enhance the retention of bargaining unit employees. The Home, shall with other Employers signatory to this Agreement, pool such funding pursuant to the methodology set forth above. In such event, the Master contribution rate shall continue at 25.05% of gross payroll. In the event such money from the State of New York is not available, the Employers shall be entitled to an additional aggregate credit of twenty million dollars ($20,000,000) from the Benefit intended to maintain an effective contribution rate of 25.05%.

The parties shall promptly meet with the Impartial Chair, and with the participation and assistance of the BF to establish the specific procedures for determining and awarding credits provided herein. While the Homes will be paying the contributions required under the MOA and will be entitled to shared credits in the amount of the aggregate retention funding over the life of the 2014 MOA, if the actual aggregate retention funding credits are either insufficient to, or in excess of, the amounts necessary to reduce the effective contribution rate of the Homes by three (3%) percentage points, the parties shall meet with the Impartial Chairman to discuss the implications of such differential

Very truly yours,

Daniel J. Ratner
General Counsel, 1199SEIU, UHWE

DJR:ccb

**NEW YORK CITY PRINCIPAL HEADQUARTERS**
310 West 43rd St.
New York, NY 10036
(212) 582-1890
www.1199seiu.org

**ALBANY**
155 Washington Ave.
Albany, NY 12210
Tel. (518) 396-2300
Fax (518) 438-1140

**BALTIMORE, MARYLAND**
611 North Eutaw Street
Baltimore, MD 21201
Tel. (410) 332-1199
Fax (410) 332-1895

**MASSACHUSETTS**
150 Mt. Vernon Street, 3rd Fl.
Dorchester, MA 02125
Tel. (617) 284-1199
Fax (617) 474-7150

**BUFFALO**
2421 Main Street, Suite 100
Buffalo, NY 14214
Tel. (716) 982-0049
Fax (716) 876-0930

**FLORIDA**
14645 NW 77th Avenue, Ste. #201
Miami Lakes, FL 33014
Tel. (305) 623-3000
Fax (305) 826-1604

**GOUVERNEUR**
95 E Main Street
Gouverneur, NY 13642
Tel. (315) 287-0013
Fax (315) 287-7228

**HICKSVILLE**
100 Duffy Ave., Suite 3 West
Hicksville, NY 11801
Tel. (516) 542-1115
Fax (516) 542-0919

**NEW JERSEY**
555 Route 1 South, 3rd Fl.
Iselin, NJ 08830
Tel. (732) 287-8113
Fax (732) 287-8117

**ROCHESTER**
259 Monroe Ave., Suite 220
Rochester, NY 14607
Tel. (585) 244-0830
Fax (585) 244-0356

**SYRACUSE**
250 South Clinton, Suite 200
Syracuse, NY 13202
Tel. (315) 424-1743
Fax (315) 479-6116

**WHITE PLAINS**
99 Church St.
White Plains, NY 10601
Tel. (914) 599-6700
Fax (914) 993-6714

Exhibit _____

June _____, 2015

Re:    2014-17 Benefit Fund Minimum Rates

Dear      :

      This letter is delivered simultaneously with the execution of the 2014-17 Memorandum of Agreement between 1199SEIU United Healthcare Workers East and [INSERT NAME OF HOME] ("Home") which has bargained with the facilities listed on Schedule A of the 2014 MOA, collectively referred to as "Greater New York Homes" or "Homes".

      Under that Agreement, the Minimum Benefit Fund Contribution Rates shall be as follows:

|                 | 4/1/15  | 4/1/16  | 4/1/17  |
|-----------------|---------|---------|---------|
| Minimum Rates   | 26.30%  | 26.30%  | 26.30%  |

      The combined Minimum Contribution Rate to the Benefit Fund and the Pension fund for the duration of this Agreement shall not exceed 38%.

Accepted and Agreed to:                Accepted and agreed to:

Exhibit ________

June ______, 2015

Re: 2014-17 Non-Parity Wage Increases

Dear ____________________:

This letter is delivered simultaneously with the execution of the 2014-2017 Memorandum of Agreement between 1199SEIU United Healthcare Workers East and [INSERT NAME OF HOME] ("Home") which has bargained with the facilities listed on Schedule A of the 2014-2017 MOA.

Under that Agreement, the wage increases for employees of non-parity employers covered by the GNYHCFA, ESLG, and SNYA, and related independent employers, shall be calculated as heretofore, i.e., the wage increases shall be calculated on the Master Facility wage base.

Accepted and Agreed to:

______________________________

Accepted and Agreed to:

[signature]

142163

Exhibit _____

June _____, 2015

Re:   2014–17 Legal Service Plan Contribution Rates

Dear   :

        This letter is delivered simultaneously with the execution of the 2014-2017 Memorandum of Agreement between 1199SEIU United Healthcare Workers East and [INSERT NAME OF HOME] ("Home") which has bargained with the facilities listed on Schedule A of the 2014-2017 MOA.

        Under that Agreement, the contribution to the legal service plan shall increase $10.00 per year to $125 per year per full time employee.

Accepted and Agreed to:                                     Accepted and agreed to:

4824-1030-6597, v. 1

1-991-00003: Document in ProLaw